# Exhibit B

FINRA DISPUTE RESOLUTION, INC.
DOCKET NO.

*In the matter of arbitration*

CHARLES PETER WALLACE,

      Claimant,

vs.

MORGAN STANLEY SMITH
BARNEY LLC a/k/a MORGAN STANLEY
WEALTH MANAGEMENT a/k/a MORGAN
STANLEY, CRD#149777

      Respondent.

_____/

## STATEMENT OF CLAIM

      Claimant Charles Peter Wallace hereby submits the following Statement of Claim against Morgan Stanley Smith Barney LLC, a/k/a Morgan Stanley Wealth Management a/k/a Morgan Stanley, CRD# 149777 ("Morgan Stanley"), and shows the following:

*1.*    *Introduction*

      This is a claim for wrongful termination and Form U-5 defamation.  It is also a claim for cancellation of a forgivable promissory note that Wallace signed in connection with a bonus that was earned and paid to Wallace when he became employed with Smith Barney.

      The termination of a registered person can–and in this case did–have serious financial consequences.  Therefore, the standard practice of member firms is to employ progressive discipline and not to terminate a registered person unless serious misdeeds have occurred, and a member firm will be liable where it terminates a registered person without just cause.  In this instance, no cause existed.

As the panel will learn, Wallace ...

- Did NOT commit any sales practice violation.

- Did NOT mishandle a customer's account in any way, shape or form.

- Did NOT make any false statement (or omission) to any customer about anything.

- Did NOT make any false statement (or omission) to his member firm about anything.

- Did NOT make any recommendation to any customer that a customer regretted.

- Did NOT engage in any conduct that was sexist, prejudicial, discriminatory, threatening, demeaning, violent, racist, or anything else that one could think of.

- Did NOT engage in any misdeed–certainly not one that would rise to the level of cause for termination.

This matter is governed by the FINRA Code of Arbitration Procedure for Industry Disputes ("Code"). The pleading requirements applicable in Court do not apply in a FINRA arbitration. Rule 13302(a) of the Code provides that a statement of claim is adequate when it "specif[ies] the relevant facts and remedies requested." The rule also provides that "[t]he claimant may include any additional documents supporting the statement of claim." Therefore, this statement of claim will present the relevant facts, set forth the remedies requested, and attach certain supporting documents. This statement of claim will not set forth "counts" or "claims" or "causes of action," other than to note broadly that this is an action for wrongful termination and

defamation.[1]

2.      *Factual Background on Wallace*

Wallace became registered in 1992 when he was employed with Raymond James & Associates, Inc.  In 2003, Wallace moved to Wachovia Securities Financial Network, the independent channel of Wachovia Securities and created his own branch.  In July 2008, Wallace was recruited from Wachovia Securities and given a nine-year deal to come over to the Miami Beach office of Smith Barney with his assets and partner and close his independent branch.  In 2009, Smith Barney and Morgan Stanley created a new venture and Wallace became employed with the new venture.  By the summer of 2013, when he was abruptly fired, Wallace was a Million dollar producer.  He had over $120 million in assets under management including annuities and 401K plans.  After over 21 years in the industry, Wallace also had a clean CRD.

3.      *The Allianz Nightmare*

In the late Spring of 2013, one of Wallace's customers informed him that he owned four annuities that he had purchased through Allianz and he wanted to liquidate them and use the proceeds for personal reasons.  The annuities were NOT held in the customer's account at Morgan Stanley and Wallace was NOT the broker of record for the annuities.  The customer asked Wallace to find out how much would be paid to him on liquidation.  Wallace took on this project purely to provide customer service to an existing customer.  Wallace was not going to receive any compensation when the annuities were liquidated and the proceeds were not going into the Morgan Stanley account for re-investment and, therefore, Wallace had no personal

---

[1]      Wrongful termination and defamation fall within these causes of action: (1) breach of fiduciary duty, (2) negligence, (3) breach of contract, (4) breach of duty of good faith and fair dealing, (5) wrongful termination, (6) violation of FINRA Rule 2110, (7) conversion and turn over of deferred compensation, (8) defamation, and (9) cancellation of the promissory note. Wallace seeks compensatory damages and punitive damages, costs and interest.

incentive other than to provide a service to the customer to assist the customer in liquidating the annuities.

     *a.*     *Call No. 1*

     Since the policies were purchased through another advisor, Wallace contacted Allianz and was told they would not speak with him until he submitted a change of broker or servicing agent application.  He was told this was necessary in order for Allianz to provide him with any information about the annuities.  Therefore, Wallace obtained the form from Allianz, completed it, had the client sign it,  and sent it to Allianz.

     *b.*     *Call No. 2*

     After the paperwork was presented to Allianz, Wallace called the annuity company and was told that the particular policies owned by the client were a different type of annuity than those offered through Morgan Stanley channels and therefore: (1) Allianz would not process the change of broker application or allow Wallace to become the agent of record or servicing agent and (2) Allianz would not provide Wallace information about the client's annuities without verbal approval from the client.  Further, the Allianz representative told Wallace that he needed to get the client on the phone in order to obtain any information about the policies.

     Wallace then proceeded to get the client on a three-way call with the Allianz representative, at which time the client authorized Allianz to provide all information Wallace requested on the policies.  The annuity company then provided Wallace the current contract and surrender information about the policies.  Afterwards, Wallace analyzed the information and warned the client, in writing and followed up verbally, that after penalty, surrender fees, and income taxes he would lose 60% of his investment.  Wallace recommended to the client that he keep the policies and seek out alternative sources of funds.  The client informed Wallace that he

wanted to surrender the policies regardless, and he asked for Wallace's help in surrendering the annuities and obtaining the cash.

        *c.*      *Call No. 3*

      Wallace set up another three-way call in order for the client to give instructions to Allianz to surrender.  During that call, the Allianz representative said that verbal orders would not be accepted and the client needed to submit forms to liquidate.  Wallace and the client asked the Allianz representative to send the surrender documents directly to the client.

        *d.*      *Call No. 4*

      A week later the client called and said he had not received any forms from Allianz. Wallace then set up another three-way call, and this time Wallace and the client asked that the surrender forms be sent to Wallace via email.  Wallace received the forms, and mailed them on to the client with an addressed envelope for the client to mail them back directly to Allianz.  The client followed Wallace's instructions and mailed the forms directly to Allianz.  A week or so later, the client called Wallace and said he filled them out, had them notarized, but never received his proceeds or any acknowledgment of receipt of his request from Allianz.  At this point, the client was understandably very frustrated and he was beginning to take his frustration out on Wallace.

        *e.*      *Call No. 5*

      Wallace again set up a three-way call to find out what had happened.  Wallace and the client were informed the forms had been received, and the proceeds would be sent very soon.

        *f.*      *Call No. 6*

      Again, the client did not receive the proceeds and left Wallace a message asking him to find out where his money was.  Now, Wallace was completely frustrated.  It seemed to him that

Allianz was doing everything it could to postpone the surrender. Wallace again called the annuity company and was told by a representative that someone would research why the transaction had not gone through and would call Wallace back. No one ever called Wallace back or the client.

> g.    *Call No. 7*

The client was now very upset. He asked Wallace via text message to find out where his proceeds were. Wallace called Allianz and was told that because of the size of the transaction, the proceeds were never sent and the policies would now enter into an internally-mandated "conservation period," meaning a period of time for Allianz to try to talk the client out of surrendering. In other words, it was a period of time for Allianz to try and "conserve" the assets at Allianz. Wallace was understandably outraged and completely frustrated by this lack of professionalism and the blatant failure to follow the client's instructions and wishes. The representative of Allianz asked for Wallace's assistance to speak with the client to talk him out of surrendering. Wallace refused to reach out the client and told the representative of Allianz that the client was out of the country in "Sub-Saharan Africa," an obvious exaggeration to make his frustration known. Wallace also asked to speak with a supervisor, and was told a supervisor would contact him. However, once again, no one called Wallace back.

> h.    *Allianz gets Wallace fired for his sub-Sahara comment*

Several weeks later, Kevin McCarty, the local complex manager for Morgan Stanley, called Wallace into a meeting asking Wallace to "admit guilt" and stated that he would "protect" Wallace. Wallace told McCarty, "protect me from what?" McCarty ended the meeting and walked Wallace into a conference room where he started accusing Wallace of lying to Allianz about the Sub-Sahara comment. Wallace admitted he said the "Sub-Sahara" comment and

explained it was out of frustration and it should have been obvious to the representatives of Allianz that the "sub-Sahara" comment was not meant to be taken seriously, but was Wallace's effort to make his frustration known to them.  Apparently, Alianz had given a recording of the Sub-Sahara phone call to Morgan Stanley and Allianz said Wallace had lied.

Several weeks later, on June 27, 2013, Wallace began a pre-arranged and long approved three-week vacation.  Wallace was in the office all morning and nothing was mentioned to him all day that anything was wrong.  After leaving work, Wallace went home to finish packing and to get his dogs and fiancé for the vacation.  While Wallace was in the car with his fiancé, driving to Colorado, he was sent an email and told to come back to the main office immediately. Wallace immediately called McCarty, advised him that he was in the car driving to Colorado, and reminded McCarty that this was the start of Wallace's only vacation for 2013 and that McCarty had approved it.  McCarty terminated Wallace on the spot.  Within minutes, the firm deleted Wallace's Blackberry and had his insurance and all benefits cut off within days.  Wallace was stuck in Colorado with no access to prescriptions or insurance if something were to happen.

Just weeks earlier, Kevin McCarty had been in Wallace's office to congratulate him on his new levels of assets under management and production for mid-year 2013, without any mention of these issues.

4.      *The second nightmare*

Wallace was completely shocked and unprepared for his termination.  Many, if not most, brokers keep records of their production and product mix at home in case the need arises for a sudden move to another firm.  The reason is that, to hire someone, all firms require some idea of the registered person's production and mix of business.  Wallace had none of those types of documents when he was abruptly fired and locked out of the Morgan Stanley office.

Wallace's second nightmare began when he tried to find new employment.  He found several huge obstacles to gaining new employment.

First, the major wire houses would not even talk to him because he had been terminated by Morgan Stanley.

Second, the next level of firms wanted to know (1) what was going to appear on his Form U-5 and (2) what his level of production, assets under management, and mix of business had been.

Third, Morgan Stanley waited until the last day–the 28th day–to submit the Form U-5 to the Central Registration Depository, thus effectively gaining an injunction against Wallace for 30 days since it was submitted on a Friday at 4 pm.  Then, Morgan Stanley waited another week before it mailed the Form U-5 to Wallace so he would not know what the tell prospective employers as to what his Form U-5 was going to say.

Fourth, The Form U-5 said Wallace was discharged because of:

LOSS OF CONFIDENCE RELATED TO EMPLOYEE'S

HANDLING OF AN ANNUITY TRANSACTION.

*See* Exhibit 1, BrokerCheck Report for Peter Wallace.  The implication to any reasonable person who reads that explanation is that Wallace mishandled an annuity transaction for a customer! That is utterly FALSE!

Fifth, the only job that Wallace could find was in Fort Lauderdale with Oppenheimer & Co., meaning that Wallace now has to make a daily commute of over two hours each day. Oppenheimer made its offer of employment of Wallace contingent on his securities licenses transferring to Oppenheimer.

CARLSON & LEWITTES, P.A.
ONE SOUTHEAST THIRD AVENUE • SUITE 1200 • MIAMI, FL 33131 • 305-372-9700

Sixth, as evidence that a reasonable reader of the Form U-5 would believe that Wallace mishandled an annuity transaction for a customer, when the State of Florida, Division of Financial Services, received the Form U-5, it initiated an investigation and HELD UP THE TRANSFER OF WALLACE'S LICENSE FOR FOUR MONTHS!  His license was not cleared by the State of Florida until October of 2013.  Wallace was not approved to do business in Michigan or Texas until mid-November.  Wallace's largest single account, which generates $90,000 in annual fees, is located in Texas.

The question has to be asked, "Why would Morgan Stanley treat Wallace so shabbily?"  The answer is that he was a Million dollar producer and Morgan Stanley wanted to do everything possible to (1) inhibit his ability to gain new employment at a major firm, (2) delay the transfer of his licenses, and thereby (3) have the remaining brokers at Morgan Stanley contact Wallace's customers to convince them to stay with Morgan Stanley.  This is the *modi operandi* of Kevin McCarty and Morgan Stanley.  But, there is more:

1.      Morgan Stanley brokers called Wallace's customers and slandered him.  For instance, Mr. Matthew Marino was assigned many of the accounts of Wallace.  Mr. Marino was contacting the customers of Wallace, and saying to customers, "Do you really want to work with someone that Morgan Stanley had to fire?" to convince the customers to keep their assets with Morgan Stanley.

2.      Morgan Stanley shut off Wallace's personal cell phone (which was a number he had before he joined Smith Barney and all of his customers had his cell phone number).  Morgan Stanley would not release the number so Wallace could re-instate service.[2]

_____

[2]      Morgan Stanley also has had building security ban Wallace from the building, and he is no longer able to see his primary physician in the same building!

9

3.      Morgan Stanley froze Wallace's accounts and would not let them transfer.

5.      *The Third Nightmare*

If all of this were not enough, now Morgan Stanley has demanded re-payment of the forgivable loan that was made to him as an earned bonus.  These forgivable loans are set up as forgivable over nine years.  Clearly, the entire loan would have been forgiven over time if Wallace had not been terminated without cause by Morgan Stanley.

6.      *The Fourth Nightmare*

Wallace also had $175, 000 in deferred compensation which was set to vest in several weeks taken from him as part of the termination.  Wallace should be entitled to this deferred compensation.

7.      *The Fifth Nightmare*

The stress of the termination on Wallace's personal life has caused his fiancé to move to Naples, devastating Wallace.

8.      *Industry Practices and Procedures*

Morgan Stanley's defense will be that Wallace was terminable at will and it cannot be liable for firing Wallace.  Therefore, we must provide other information so that the panel clearly understands that the at-will doctrine has no applicability in this arbitration and that the conduct of Morgan Stanley was designed to destroy Wallace.  This is a necessary step in the analysis.

Morgan Stanley will likely contend in this case, as it did in *Rosensweig v. Morgan Stanley*, NASD Case No. 01-05703, and *Morgan Stanley v. Oscar Melhem Marcote*, NASD Case No. 02-04012, that a registered person may be terminated at will and it is not required to compensate the terminated employee for wrongful termination.  Copies of the arbitration awards in *Rosensweig* and *Melhem* are attached as Exhibits 2 and 3.  The arbitration panels in

*Rosensweig* and *Melhem* properly rejected Morgan Stanley's at-will arguments and held that Morgan Stanley was liable for terminating its employees without cause.[3]

    a.    *The at-will doctrine is changed by the nature of the securities business and its rules and regulations.*

It is important to emphasize certain preliminary points.  First, the securities industry is unique for many reasons:

•   <u>No other industry is so highly regulated</u> and, importantly, the securities industry is a *self-regulated* industry.  A broker is required to pass exams in order to be licensed by the self-regulatory organization ("SRO") to which his or her firm belongs (*e.g.,* NYSE or NASD or both, now FINRA) and a broker is required to be licensed in every state where he or she has customers. When a broker becomes employed at a firm, the firm and the broker are required to submit a Form U-4 (Uniform Application for Securities Industry Registration or Transfer) to the CRD which then transmits the form to all of the SROs, and to all State and federal regulators. When a broker terminates employment, the firm is required to submit a Form U-5 (Uniform Termination Notice for Securities Industry Registration) to the CRD wherein the firm is required to state truthfully the reasons for the termination.  When a broker is terminated for cause, it usually results in that broker being unable to become re-employed in the industry.

---

[3]    In *every* wrongful termination arbitration in *every* state of the United States, whether before the NYSE, NASD, or FINRA, the brokerage firm claims it could fire the employee at-will.  It is not a novel defense.  Lately, however, the brokerage firms have been tacitly conceding, by lack of a real argument in opposition, that financial advisors can be terminated only for just cause, notwithstanding that the employee handbook or even a contract of employment may say that the employment is at-will.

CARLSON & LEWITTES, P.A.
ONE SOUTHEAST THIRD AVENUE • SUITE 1200 • MIAMI, FL 33131 • 305-372-9700

- <u>The industry has its own codes of conduct</u> (NYSE and NASD rules).  By way of example, FINRA has its own Conduct Rules, and the very first Rule, which is Rule 2110, states:

> A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade.

This Rule applies to all dealings of a firm, including those with its employees.

- <u>Industry-wide mandatory arbitration exists for resolution of all disputes</u>, including disputes with customers, other firms, and employees.  The industry has made it mandatory that disputes between a firm and a registered person be arbitrated.  The Form U-4, which is signed by both the broker and the firm, states that "I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm ...."  Wallace and Morgan Stanley are signatories to Wallace's Form U-4.

- <u>Every firm stresses to its brokers (whether in their training programs or in regular sales meetings) that they are their own bosses, they are building their own books of business, the customers belong to the brokers, and they can work at the firm until they retire if their production meets the minimum levels</u>.  This principle is central to the industry.  The firms provide an incentive to a broker and encourage him or her to grow their book of business.  Every broker is trained to build "equity" in their own business.  Because of this actual practice of building equity, a broker's book of business is fairly portable when a broker moves from one firm to another. Typically, a broker will move 80% to 90% and sometimes more of his book to a new firm.[4]  A standard procedure has developed over the years to insure a high success rate: the

---

[4]      When Wallace moved to Smith Barney, he was encouraged to contact his customers and move his book of business to Smith Barney.

CARLSON & LEWITTES, P.A.
ONE SOUTHEAST THIRD AVENUE • SUITE 1200 • MIAMI, FL 33131 • 305-372-9700

broker creates a list of his accounts, including names, addresses, and contact information, and he or she resigns in the afternoon and goes to the new firm where letters are sent to the customers that evening with account transfer papers and return envelopes. Typically, the broker immediately calls his or her customers to alert them of the change and to expect the account transfer papers. In the meantime, the losing firm will immediately assign the accounts to other brokers in the branch and encourage them to call the customers as soon as possible to try to retain the accounts. Most often, it does not get nasty, but it can and does sometimes.

•    The Major Firms have signed the Protocol for Broker Recruiting. For years, many firms (especially Merrill Lynch) were nasty about a broker departing. Merrill Lynch often sued the departing broker in court and obtained *ex parte* injunctions to prohibit the broker from soliciting his or her clients to move their accounts to the new firm. The injunction would later be dissolved, but by the time it was finally dissolved the firm had achieved an advantage in keeping the customers. The major players in the industry eventually realized it was a zero-sum game, not to mention unseemly to be fighting over customers when they should have had the customers' best interests at heart, not their own pocket book. They created the Protocol for Recruiting Brokers. A copy of the Protocol is attached as Exhibit 4. Initially, there were three signatories to the Protocol: Merrill Lynch, UBS, and Smith Barney. Now, virtually all of Wall Street has signed on. It ended decades of highly contentious litigation between receiving and losing brokerage firms in the recruiting of brokers and their books of business. Under the Protocol, a departing broker may create a list of his customers, their addresses, telephone numbers, facsimile numbers, and e-mail addresses and take that list to the receiving firm, and the parties agree that no litigation may be initiated. The Protocol is good for the industry, and for

CARLSON & LEWITTES, P.A.
ONE SOUTHEAST THIRD AVENUE • SUITE 1200 • MIAMI, FL 33131 • 305-372-9700

customers as well, and has made it very easy for a departing broker to leave and move his book of business to the new firm.  Morgan Stanley is a member of the Protocol.

        •        <u>Brokerage Firms pay enormous sums (described as up-front money) to broker to move to a new firm</u>.  Professional recruiters spend their days working the phones and calling brokers to convince them to move to new firms.  The firms are willing to pay a broker anywhere from 50% to 250% of his or her trailing twelve months of gross production.  In Wallace's case, he could have received in excess of $2.5 million to move to other firms, but he remained at Morgan Stanley because he was happy at Morgan Stanley and did not want to move.

        •        <u>Despite the Protocol, some firms still engage in nasty tactics designed to ruin a broker's career and livelihood</u>.  Now that the firms cannot file injunctions, they have resorted to a new tactic on occasion when they suspect that a broker may be thinking about leaving for another firm.  It involves abruptly firing the broker for alleged "cause" and marking the Form U-5 in a manner to suggest the broker is untrustworthy.  The marking of the Form U-5 usually results in new firm refusing to hire the broker and the broker finding himself unable to get re-employed except at a small firm that is willing to take the regulatory risk of hiring someone who was terminated for cause.  Also, the termination for cause often results in a regulatory inquiry which delays the licensure of the broker and puts the broker out of business until the inquiry is completed.  ***This is the tactic that Morgan Stanley used on Wallace!***

        •        <u>Brokerage firms cannot make defamatory statements on a Form U-5</u>.  In Florida, as in most states, a broker-dealer is liable for false and defamatory statements it puts on a Form U-5 when an employee is terminated.  Thus, Morgan Stanley is liable for defamation if it negligently (i.e., it knew or should have known) put a false statement on the Form U-5.

Second, consistent with these unique features of this industry, or more precisely to fulfill the moral and legal objectives of these aspects of the securities industry, the custom and practice of the securities industry is that securities firms do not terminate brokers unless good cause exists.  Put differently, a firm will be liable to compensate a broker who is terminated without cause.  In addition, it is the usual and customary practice of the securities industry to employ progressive discipline, where coaching, letters of education, letters of caution, and even suspensions are employed in the appropriate circumstances long before a broker is terminated.  Morgan Stanley employs progressive discipline.  Wallace received no progressive discipline.

Third, securities arbitrations are proceedings in equity.  The securities firms acknowledge and promote this.  On the first page of the NASD Arbitrator's Manual, which was created by the Securities Industry Conference on Arbitration, an organization of brokerage firms, it states:

> Equity is justice in that it goes beyond the written law.  And it is equitable to prefer arbitration to the law court, for the arbitrator keeps equity in view, whereas the judge looks only to the law, and the reasons why arbitrators were appointed was that equity might prevail.

*The Arbitrator's Manual* at 1, *citing*, Domke on Aristotle.[5]  The federal court in New York put it this way: "an arbitrator may substitute his sense of equity and justice in place of established legal principles."  *In re: Arbitration between Advest, Inc. and Asseoff*, 1993 WL 119690 (S.D.N.Y. 1993).

Both legal and equitable principles dictate that Wallace could not be terminated by Morgan Stanley unless just cause existed.  We have collected 116 securities industry cases and arbitration awards on this issue that are summarized on Exhibit 5.  Each of these cases was a

---

[5]     The Manual is available at  http://www.finra.org/ArbitrationMediation/Neutrals/Education/ArbitratorsManual/.

CARLSON & LEWITTES, P.A.
ONE SOUTHEAST THIRD AVENUE • SUITE 1200 • MIAMI, FL 33131 • 305-372-9700

wrongful termination case where the brokerage firm asserted the at-will defense and the court or the arbitration panel rejected it and awarded damages to the broker for wrongful termination. The reasons the at-will defense has no merit in the securities industry is (1) the case law holds that an agreement to arbitrate disputes arising out of an employment relationship converts an at-will relationship to one that can be terminated only for just cause, and (2) the custom and practice of the securities industry is that brokers may be terminated only for just cause. This law is applicable even in cases where the employee has signed a contract or a form indicating that his or her employment is terminable at-will.

      *b.     An at-will relationship is converted to one requiring "just" cause to terminate an employee where an agreement to arbitrate exists.*

As noted above, each and every financial consultant is *required* to sign a Form U-4, which *requires the financial consultant and the firm to arbitrate every dispute arising out of his or her employment with the firm.* The requirement to arbitrate all disputes arising out of the employment relationship changes an at-will contract. Every at-will relationship becomes a relationship that can be terminated only for *just cause* where an agreement to arbitrate exists. *Smith v. Kerrville Bus Co.*, 709 F.2d 914, 918 (5th Cir. 1983). Thus, the Form U-4 is an express agreement that Wallace could not be terminated without just cause.

This *is the law* in the securities area. The first case in the securities area to apply this law was from the Seventh Circuit Court of Appeals in *Shearson Hayden Stone, Inc. v. Liang*, 653 F.2d 310 (7th Cir. 1981). In that case, Shearson fired Liang because he worked as a projectionist at, and wanted to become a fifty percent owner of, an X-rated movie theater, while continuing to serve as a financial consultant. Liang filed an arbitration proceeding for wrongful termination. At the arbitration, Shearson argued that Liang was an at-will employee and it could

CARLSON & LEWITTES, P.A.
ONE SOUTHEAST THIRD AVENUE • SUITE 1200 • MIAMI, FL 33131 • 305-372-9700

fire him for any reason. The arbitrators disagreed and awarded Liang $50,000 for wrongful termination. Shearson filed an action in federal court to vacate the award. Eventually, the case went up to the federal court of appeals, which ruled that:

> Shearson's further reply that Liang's employment was terminable at will is without merit. It has been held repeatedly that an agreement to arbitrate disputes about employee discharges implies a requirement that discharges be only for "just case."

More recently, in *PaineWebber, Incorporated v. Agron*, 49 F.3d 347 (8th Cir. 1995), PaineWebber sought to overturn an arbitration award in favor of Agron, a financial consultant who had sued for wrongful termination. Agron was terminated for signing a client's name on account transfer forms, which is a violation of NASD Rules. Agron claimed there were mitigating reasons why he signed the customer's name on the form. The NASD investigated and issued a letter of caution to Agron. Agron then filed an arbitration case against PaineWebber for wrongful discharge. PaineWebber argued to the arbitration panel that Agron was an at-will employee and it could fire him for any reason, and further it had just cause to fire him. The arbitration panel disagreed and awarded Agron $290,000 in damages, finding that PaineWebber improperly terminated him and unjustly interfered with Agron's book of business.

On appeal to the United States Court of Appeals for the Eight Circuit, PaineWebber again argued that the award should be vacated because an at-will employee can be terminated at any time. The court rejected this argument, saying:

> PaineWebber also contends that the award must be vacated because it manifestly disregards ... [the] employment-at-will doctrine. This argument overlooks the very nature of this arbitration proceeding. Even accepting that Kansas is an employment-at-will state, and further assuming that we would be willing to apply a manifest disregard analysis, PaineWebber's relationship with Agron under the oversight of the NASD contemplated the use of the arbitration procedure as a means of settling employment-related disputes. This process necessarily

alters the employment relationship from at-will to something else--
*some standard of discernable cause is inherently required* in this
context where an arbitration panel is called on to interpret the
employment relationship.... Accordingly, the arbitration panel had
the power to determine whether the firing was justified. (Emphasis
added).

In *DeLuca v. Bear Stearns & Co, Inc.*, 175 F.Supp.2d 102 (D.Mass. 2001), Ms.

DeLuca, a financial consultant was terminated and she sued for wrongful termination. DeLuca

had signed an acknowledgment that she was an at-will employee and that her employment was

terminable at any time for any reason. Nonetheless, the court held that:

A[n] arbitrator might conclude that Bear Stearns' U-4 arbitration
agreement, its Culture Book and practices, together with statements
from management created an implied employment contract in
which it *could not* terminate DeLuca except for good cause....
(Emphasis in original).

*See also Pierce v. Shearson Lehman Hutton, Inc.*, 1990 WL 60751 (N.D.Ill. 1990), where the

court stated:

An agreement to arbitrate disputes about employee discharges
implies a requirement that discharges be only for "just cause."

In *Morgan Stanley v. Oscar Melhem Marcote*, NASD Case No. 02-04012, which

is attached as Exhibit 3, Mr. Melhem sued Morgan Stanley for wrongful termination and for

cancellation of the promissory note he signed at the time he was recruited to join Morgan

Stanley. Morgan Stanley asserted who Mr. Melhem was an at-will employee who could be

terminated at any time for any reason. The NASD arbitration panel disagreed and awarded Mr.

Melhem a total award of $1,860,752 and, in addition, forgave the promissory note he owed to

Morgan Stanley of over $385,500. The panel specifically addressed the issue of "terminable at

will" when it stated in the Award:

> 2.      Claimant [Morgan Stanley] is liable on the Counterclaim
> and shall pay to the Respondent [Melhem] the sum of $1,750,000
> as compensatory damages.  Damages are awarded based upon
> Claimant's termination of Respondent without reasonable cause
> and Claimant's defamation of Respondent which occurred as a
> direct result of Claimants negligent failure to supervise its
> employees.

Morgan Stanley appealed the case to the United States District Court for the

Southern District of Florida on the basis, among other things, that Mr. Melhem was an at-will

employee and therefore the Panel (1) improperly considered and decided whether Morgan

Stanley had a "reasonable cause" for terminating Melhem's employment and (2) improperly

considered and decided whether Morgan Stanley's "wrongful termination" of Melhem was a

breach of an "employment agreement."  The district court rejected these arguments and held that:

> The Panel did not exceed its authority under 9 U.S.C. Section
> 10(a)(4) by deciding a question not within its authority when it
> decided whether: (1) Morgan Stanley had "reasonable cause" for
> terminating Melhem's employment; (2) the "wrongful termination"
> of Melhem was a breach of an "employment agreement" . . .

*Morgan Stanley & Co. v. Melhem,* (S.D.Fla June 4, 2004).  Morgan Stanley also argued that the

Award contravened the long-standing policy in the State of Florida under which employees are

presumptively "at-will." The Court ruled that Morgan Stanley's public policy argument "amounts

only to Morgan Stanley's disagreement with the Panel's conclusions and application of law" and

refused to vacate the Award on that basis as well.

In *Wachovia Securities, Inc. v. Wiegand*, Case No. 07CV243 IEG (S.D.Cal. 2007),

Wiegand initiated an arbitration for wrongful termination and Wachovia defended by asserting

that Wiegand, a branch manager, was terminable at-will.  Wachovia claimed that Wiegand had

failed to properly supervise a broker, which contributed to a large arbitration award in favor of a

customer.  The arbitrators disagreed and awarded Wiegand $1,5000,000 for wrongful

termination. *Wiegand v. Wachovia Securities, Inc.*, NASD Case No. 06-00462. Wachovia then sought to set aside the arbitration award in federal court and argued that the "at-will" defense required the award be vacated. The United States District Court disagreed. The Court noted that counsel for Wiegand in his final argument presented the panel with a copy of *Agron v. PaineWebber*, which is discussed above and holds that "an employee's agreement to arbitrate all disputes ... implies a for-cause termination requirement." The Court then held that the panel did not disregard the law, but rather "chose to apply an exception to that rule." In other words, *Agron, Liang, Pierce,* and *DeLuca* are exceptions to the at-will doctrine that are recognized and binding.

Several commentators have also written that the use of an arbitration agreement alters the employment at-will relationship to one that can be terminated only for just cause. *See* Employ. Discrim. Law and Litig. § 13:33; 1 Commercial Arbitration § 29:10.

Thus, the courts which have reviewed the case law have determined that employers who have agreed to arbitrate employment disputes may only fire employees for *just* cause. Every court to address this issue, including the United States Courts of Appeals for the Fifth, Seventh, and Eighth Circuits, has held that an arbitration agreement transforms an at-will relationship into one that can be terminated only for *just* case. Since Wallace and Morgan Stanley agreed to arbitrate all employment disputes, Morgan Stanley could terminate Wallace only if just cause existed. He was not an at-will employee.

c.   *The custom and practice of the securities
industry is that brokers are terminable
only for just cause and the numerous arbitration
awards evidence this custom and practice
and create arbitral common law.*

As noted in the Arbitrator's Manual, arbitrators are expected to balance the

equities.  Against this legal framework, it is important for this panel to know that other

arbitration panels (in addition to the ones mentioned above) have followed the well established

law that an agreement to arbitrate converts an at-will relationship into one that can only be

terminated for just case and have based their decisions on the custom and practice of the industry

that brokers may only be terminated where just cause exists.

We have collected court decisions and arbitration awards on this issue.  Our

collection of arbitration awards only goes back to the late 1980s.  We have found at least 116

arbitration awards where NASD and FINRA arbitration panels rejected the at-will defense and

found in favor of terminated brokers for wrongful termination.  *See* Exhibit 5, Summary of At-

Will Cases and Awards.

We have already discussed the *Melhem* case (Exhibit 3) where Morgan Stanley

argued that Mr. Melhem was an at-will employee and the panel rejected that argument, finding

Morgan Stanley liable for close to $2 million in damages and the *Wiegand* case where Wachovia

was ordered to pay Wiegand the sum of $1,500,000.

In *Rosensweig v. Morgan Stanley,* NASD Case No. 01-05730, which is attached

as Exhibit 2, Rosensweig was a financial advisor in Morgan Stanley's Miami office.  Rosensweig

was terminated by Morgan Stanley because of two customer complaints and a "difference in

investment philosophy" and he filed an NASD arbitration proceeding for wrongful termination,

among other claims.  Morgan Stanley filed a Dispositive Motion, which raised the same issue–no

claim for wrongful termination can exist where the employment was at-will.  The arbitrators

denied the Dispositive Motion.  After a full trial on the merits, the panel awarded Rosensweig

over $1.6 million.  The arbitration panel found that Rosensweig was terminated without just

cause and that the at-will doctrine did not provide any protection to Morgan Stanley.

Morgan Stanley instituted proceedings to vacate the *Rosensweig* award in the U.S.

District Court for the Southern District of Florida.  On August 16, 2005, the District Court

upheld the award.  *Rosensweig v. Morgan Stanley,* (S.D.Fla August 16, 2005).  Morgan Stanley

then appealed to the Eleventh Circuit Court of Appeals.  The Court of Appeals later affirmed.

*Rosensweig v. Morgan Stanley*, 494 F.3d 1328 (11th Cir. 2007).

In *Garcia v. Citigroup Global Markets f/k/a Smith Barney*, NASD Case No. 05-

03017, Garcia instituted an arbitration for wrongful termination, among other claims.  Smith

Barney asserted that Garcia was terminable at-will and, in any event, just cause existed to

terminate him because he was habitually late in turning in "phone orders" to the wire operator.

The panel found that good cause did not exist to terminate Garcia and awarded compensatory

damages of $1,860,000 and punitive damages of $1,750,000.

In *Newman v. Morgan Stanley* (NASD Case No. 96-03187), after Newman joined

Morgan Stanley, he was told the office he was joining would not open, he had to work in another

office, and he would not receive the up-front bonus he was promised.  *Id.*  He then hired an

attorney, who wrote a complaint letter on his behalf to the President of Morgan Stanley that made

a demand for the up-front bonus.  *Id.*  He was then given a letter that told him he had three hours

to accept a lower amount or be terminated.  *Id.*  He accepted the lower amount, but was then

subjected to various workplace conditions that amounted to constructive termination.  *Id.*

Morgan Stanley asserted as a defense that "Claimant was an employee at will who could be

terminated at any time." *Id*. The panel rejected the at-will argument and found Morgan Stanley liable for compensatory damages of $227,000 *plus* punitive damages of $200,000 *plus* attorneys' fees of $50,000. *Id*.

In *Edeline v. Merrill Lynch Pierce Fenner & Smith, Inc.*, NASD Case No. 95-04966, Edeline sued for wrongful discharge. Merrill defended on the basis that he was "an at-will employee whereby he could be terminated for any reason." Merrill asserted that it fired Edeline for copying customers' account statements that were mis-delivered from Dean Witter, then lying about it and trying to cover it up, before finally admitting his involvement. The panel disagreed that Edeline was terminable at-will and awarded Edeline actual damages representing his lost income of $496,000 and punitive damages of $250,000 for "wrongful termination."

It goes on and on. We invite the panel to read through our Summary of Cases for all of these and other cases. See Exhibit 5. These awards evidence that the custom and practice in the securities industry is that brokers can be terminated only for just cause. In deciding employment disputes, arbitrators are bound to follow the law–which requires securities firms to prove good cause or just cause existed for the termination of a registered representative even where that person acknowledges in writing that his or her employment is at-will–and to consider and balance the equities.

Also, as reflected above, the courts and arbitration panels which have reviewed the case law have determined that employers who have agreed to arbitrate employment disputes may only fire employees for just cause. The arbitrators regularly award compensatory damages *and* punitive damages in these instances because the effects of a termination for cause are so devastating to a broker's ability to earn a living.

7.     *A transcript of "the phone call"*

Wallace was hoping to attach a transcript of the phone call which allegedly resulted in his termination to this Statement of Claim. Through undersigned counsel, he made multiple requests for the recording of the call to both Morgan Stanley and Allianz. Both have refused to provide a copy. *See* Exhibit 6, Correspondence with Morgan Stanley and Allianz. This fact, that both Morgan Stanley and Allianz will not give Wallace a recording of himself, should give this Panel a clear idea that neither Morgan Stanley nor Allianz wishes for a transcript of the recording to ever see the light of day.

8.     *Relief Requested*

The panel may have noted from the discussion of arbitration awards in this area, the awards can be quite large. The reason is that when the financial advisor is a good "producer," and generates significant commissions and fees, it translates to significant damages if the financial advisor is terminated without cause or is defamed. In Wallace's case, he was making over $350,000 plus $25,000 to $30,000 of deferred compensation, plus $5,000 per year of expense allowance per year at Morgan Stanley, along with other benefits including annual 401-K match, and today he is making $150,000 less per year. It took him 23 years to build up his business and it is going to take him at least ten years to get back to where he was. Using simple math, and factoring in the benefits that are lost, Wallace's lost compensation is upwards of $2,500,000.

Based on the foregoing, Mr. Wallace requests the following relief:

1.     Compensatory damages for the loss of income, loss of book of business, loss of deferred compensation, loss of 401-K match, loss of pension

accrual, loss of pension lump sum, and for mental pain and anguish

sustained by him;

2.      Punitive damages in an amount to be determined by the panel;

3.      Pre-award interest;

4.      Forum fees and costs, including expert witness fees;

5.      Attorneys' fees, with both entitlement and amount to be determined by a

Court of competent jurisdiction;

6.      Such other and further relief as may be appropriate, including an

amendment or expungement of his Form U-5.

Dated: January 27, 2014.

*Attorneys for Claimant:*

CARLSON & LEWITTES, P.A.

By: _____
        Curtis Carlson, Fla.Bar. No. 236640
        1200 SunTrust International Ctr.
        One Southeast Third Avenue
        Miami, Florida 33131
        Telephone: 305.372.9700
        Facsimile:   305.372.8265
        E-mail: carlson@carlson-law.net

Exhibit 1



BrokerCheck Report

## CHARLES PETER WALLACE

CRD# 2232489

Report #69638-28484, data current as of Wednesday, December 18, 2013.

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 4 |
| Registration and Employment History | 5 |
| Disclosure Events | 6 |

About BrokerCheck®



BrokerCheck offers information on all current-and many former-FINRA-registered securities brokers, and all current and
former FINRA-registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the
background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with
them.

- What is included in a BrokerCheck report?
  BrokerCheck reports for individual brokers include information such as employment history, professional
  qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck
  reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the
  same disclosure events mentioned above.
  Please note that the information contained in a BrokerCheck report may include pending actions or allegations
  that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor
  of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of
  wrongdoing.
- Where did this information come from?
  The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is
  a combination of:
  - Information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and
    brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- How current is this information?
  Generally, active brokerage firms and brokers are required to update their professional and disciplinary
  information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers
  and regulators is available in BrokerCheck the next business day.
- What if I want to check the background of an investment adviser firm or investment adviser
  representative?
  To check the background of an investment adviser firm or representative, you can search for the firm or individual
  in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and
  registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at
  http://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state
  securities regulator at http://www.nasaa.org.
- Are there other resources I can use to check the background of investment professionals?
  FINRA recommends that you learn as much as possible about an investment professional before deciding to work
  with them. Your state securities regulator can help you research brokers and investment adviser representatives
  doing business in your state.

Thank you for using FINRA BrokerCheck.



Using this site/information means
that you accept the FINRA
BrokerCheck Terms and
Conditions. A complete list of
Terms and Conditions can be
found at

brokercheck.finra.org



For additional information about
the contents of this report, please
refer to the User Guidance or
www.finra.org/brokercheck. It
provides a glossary of terms and a
list of frequently asked questions,
as well as additional resources.
For more information about
FINRA, visit www.finra.org.

www.finra.org/brokercheck

**CHARLES P. WALLACE**
CRD# 2232489

Currently employed by and registered with the following FINRA Firm(s):

OPPENHEIMER & CO. INC.
100 NORTH EAST 3RD AVENUE
FORT LAUDERDALE, FL  33301
CRD# 249
Registered with this firm since: 08/02/2013

## Report Summary for this Broker



This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

### Broker Qualifications

This broker is registered with:
- 13 Self-Regulatory Organizations
- 12 U.S. states and territories

Is this broker currently suspended or inactive with any regulator? No

This broker has passed:
- 2 Principal/Supervisory Exams
- 2 General Industry/Product Exams
- 2 State Securities Law Exams

### Registration History

This broker was previously registered with the following FINRA firm(s):

MORGAN STANLEY
CRD# 149777
MIAMI BEACH, FL
06/2009 - 07/2013

CITIGROUP GLOBAL MARKETS INC.
CRD# 7059
MIAMI BEACH, FL
07/2008 - 06/2009

WACHOVIA SECURITIES FINANCIAL
NETWORK, LLC
CRD# 11025
MIAMI BEACH, FL
06/2003 - 07/2008

### Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker?  Yes

The following types of disclosures have been reported:

| Type | Count |
|------|-------|
| Termination | 1 |

### Investment Adviser Representative Information

The information below represents the individual's record as a broker. For details on this individual's record as an investment adviser representative, visit the SEC's Investment Adviser Public Disclosure website at
http://www.adviserinfo.sec.gov

©2013 FINRA. All rights reserved.   Report# 69638-28484 about CHARLES P. WALLACE. Data current as of Wednesday, December 18, 2013.

www.finra.org/brokercheck

User Guidance

## Broker Qualifications



### Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

This individual is currently registered with 13 SROs and is licensed in 12 U.S. states and territories through his or her employer.

### Employment 1 of 1

| | |
|---|---|
| Firm Name: | OPPENHEIMER & CO. INC. |
| Main Office Address: | 85 BROAD STREET |
| | 22ND,24TH FLOOR |
| | NEW YORK, NY 10004 |
| Firm CRD#: | 249 |

| SRO | Category | Status | Date |
|---|---|---|---|
| FINRA | General Securities Representative | APPROVED | 08/02/2013 |
| FINRA | General Securities Sales Supervisor | APPROVED | 08/02/2013 |
| BATS Y-Exchange, Inc. | General Securities Representative | APPROVED | 08/01/2013 |
| BATS Z-Exchange, Inc. | General Securities Representative | APPROVED | 08/01/2013 |
| Chicago Board Options Exchange | General Securities Representative | APPROVED | 08/01/2013 |
| Chicago Board Options Exchange | General Securities Sales Supervisor | APPROVED | 08/01/2013 |
| Chicago Stock Exchange | General Securities Representative | APPROVED | 08/01/2013 |
| Chicago Stock Exchange | General Securities Representative | APPROVED | 08/01/2013 |
| EDGA Exchange, Inc. | General Securities Representative | APPROVED | 08/01/2013 |
| EDGA Exchange, Inc. | General Securities Sales Supervisor | APPROVED | 08/01/2013 |
| EDGX Exchange, Inc. | General Securities Representative | APPROVED | 08/01/2013 |
| EDGX Exchange, Inc. | General Securities Sales Supervisor | APPROVED | 08/01/2013 |
| International Securities Exchange | General Securities Representative | APPROVED | 08/01/2013 |
| NASDAQ OMX PHLX, Inc. | General Securities Representative | APPROVED | 08/01/2013 |
| NASDAQ OMX PHLX, Inc. | General Securities Sales Supervisor | APPROVED | 08/01/2013 |
| NASDAQ Stock Market | General Securities Representative | APPROVED | 08/01/2013 |
| NASDAQ Stock Market | General Securities Sales Supervisor | APPROVED | 08/01/2013 |

©2013 FINRA. All rights reserved.   Report# 69638-28484 about CHARLES P. WALLACE. Data current as of Wednesday, December 18, 2013.

www.finra.org/brokercheck

## Broker Qualifications



### Employment 1 of 1, continued

| SRO | Category | Status | Date |
|---|---|---|---|
| NYSE Arca, Inc. | General Securities Representative | APPROVED | 08/01/2013 |
| NYSE Arca, Inc. | General Securities Sales Supervisor | APPROVED | 08/01/2013 |
| NYSE MKT LLC | Branch Office Manager (NYSE) | APPROVED | 08/01/2013 |
| NYSE MKT LLC | General Securities Representative | APPROVED | 08/01/2013 |
| New York Stock Exchange | Branch Office Manager (NYSE) | APPROVED | 08/01/2013 |
| New York Stock Exchange | General Securities Representative | APPROVED | 08/01/2013 |

| U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|
| California | Agent | APPROVED | 10/07/2013 |
| Connecticut | Agent | APPROVED | 10/07/2013 |
| District of Columbia | Agent | APPROVED | 10/10/2013 |
| Florida | Agent | APPROVED | 10/04/2013 |
| Georgia | Agent | APPROVED | 10/07/2013 |
| Illinois | Agent | APPROVED | 10/07/2013 |
| Michigan | Agent | APPROVED | 11/07/2013 |
| New Jersey | Agent | APPROVED | 10/08/2013 |
| New York | Agent | APPROVED | 10/07/2013 |
| Ohio | Agent | APPROVED | 10/07/2013 |
| South Carolina | Agent | APPROVED | 10/07/2013 |
| Texas | Agent | APPROVED | 11/18/2013 |

### Branch Office Locations

OPPENHEIMER & CO. INC.
100 NORTH EAST 3RD AVENUE
FORT LAUDERDALE, FL  33301

www.finra.org/brokercheck                                                           User Guidance

## Broker Qualifications

FINRA

### Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

This individual has passed 2 principal/supervisory exams, 2 general industry/product exams, and 2 state securities law exams.

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| General Securities Sales Supervisor - Options Module Examination | Series 9 | 06/06/2003 |
| General Securities Sales Supervisor - General Module Examination | Series 10 | 04/21/2003 |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| General Securities Representative Examination | Series 7 | 07/01/1992 |
| Futures Managed Funds Examination | Series 31 | 08/19/2009 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| Uniform Securities Agent State Law Examination | Series 63 | 07/08/1992 |
| Uniform Investment Adviser Law Examination | Series 65 | 12/10/1993 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

www.finra.org/brokercheck

User Guidance

## Registration and Employment History



### Registration History

The broker previously was registered with the following FINRA firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 06/2009 – 07/2013 | MORGAN STANLEY | 149777 | MIAMI BEACH, FL |
| 07/2008 – 06/2009 | CITIGROUP GLOBAL MARKETS INC. | 7059 | MIAMI BEACH, FL |
| 06/2003 – 07/2008 | WACHOVIA SECURITIES FINANCIAL NETWORK, LLC | 11025 | MIAMI BEACH, FL |
| 08/2002 – 06/2003 | RAYMOND JAMES FINANCIAL SERVICES, INC. | 6694 | ST. PETERSBURG, FL |
| 07/1992 – 08/2002 | RAYMOND JAMES & ASSOCIATES, INC. | 705 | ST. PETERSBURG, FL |

### Employment History

Below is the broker's employment history for up to the last 10 years.

Please note that the broker is required to provide this information only while registered with FINRA and the information is not updated after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 08/2013 – Present | OPPENHEIMER & CO. INC. | FT. LAUDERDALE, FL |
| 06/2009 – 07/2013 | MORGAN STANLEY SMITH BARNEY | MIAMI BEACH, FL |
| 07/2008 – 06/2009 | CITIGROUP GLOBAL MARKETS INC | MIAMI BEACH, FL |
| 06/2003 – 07/2008 | WACHOVIA SECURITIES FINANCIAL ADVISOR | MIAMI BEACH, FL |

### Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

No information reported.

www.finra.org/brokercheck

User Guidance

## Disclosure Events



What you should know about reported disclosure events:

1. All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

2. Certain thresholds must be met before an event is reported to CRD, for example:
   - A law enforcement agency must file formal charges before a broker is required to disclose a particular criminal event.
   - A customer dispute must involve allegations that a broker engaged in activity that violates certain rules or conduct governing the industry and that the activity resulted in damages of at least $5,000.

3. Disclosure events in BrokerCheck reports come from different sources:
   - As mentioned at the beginning of this report, information contained in BrokerCheck comes from brokers, brokerage firms and regulators. When more than one of these sources reports information for the same disclosure event, all versions of the event will appear in the BrokerCheck report. The different versions will be separated by a solid line with the reporting source labeled.

4. There are different statuses and dispositions for disclosure events:
   - A disclosure event may have a status of pending, on appeal, or final.
     - A "pending" event involves allegations that have not been proven or formally adjudicated.
     - An event that is "on appeal" involves allegations that have been adjudicated but are currently being appealed.
     - A "final" event has been concluded and its resolution is not subject to change.
   - A final event generally has a disposition of adjudicated, settled or otherwise resolved.
     - An "adjudicated" matter includes a disposition by (1) a court of law in a criminal or civil matter, or (2) an administrative panel in an action brought by a regulator that is contested by the party charged with some alleged wrongdoing.
     - A "settled" matter generally involves an agreement by the parties to resolve the matter. Please note that brokers and brokerage firms may choose to settle customer disputes or regulatory matters for business or other reasons.
     - A "resolved" matter usually involves no payment to the customer and no finding of wrongdoing on the part of the individual broker. Such matters generally involve customer disputes.

For your convenience, below is a matrix of the number and status of disclosure events involving this broker. Further information regarding these events can be found in the subsequent pages of this report. You also may wish to contact the broker to obtain further information regarding these events.

|  | Pending | Final | On Appeal |
|---|---|---|---|
| Termination | N/A | 1 | N/A |

www.finra.org/brokercheck

User Guidance



## Disclosure Event Details

When evaluating this information, please keep in mind that a disclosure event may be pending or involve allegations that are contested and have not been resolved or proven. The matter may, in the end, be withdrawn, dismissed, resolved in favor of the broker, or concluded through a negotiated settlement for certain business reasons (e.g., to maintain customer relationships or to limit the litigation costs associated with disputing the allegations) with no admission or finding of wrongdoing.

This report provides the information exactly as it was reported to CRD and therefore some of the specific data fields contained in the report may be blank if the information was not provided to CRD.

### Employment Separation After Allegations

This type of disclosure event involves a situation where the broker voluntarily resigned, was discharged, or was permitted to resign after being accused of (1) violating investment-related statutes, regulations, rules or industry standards of conduct; (2) fraud or the wrongful taking of property; or (3) failure to supervise in connection with investment-related statutes, regulations, rules, or industry standards of conduct.

**Disclosure 1 of 1**

| | |
|---|---|
| Reporting Source: | Firm |
| Employer Name: | MORGAN STANLEY WEALTH MANAGEMENT |
| Termination Type: | Discharged |
| Termination Date: | 06/27/2013 |
| Allegations: | THE EMPLOYEE WAS DISCHARGED AFTER ALLEGATIONS HE MADE INACCURATE STATEMENTS TO AN ANNUITY COMPANY REGARDING A CLIENT'S WHEREABOUTS. |
| Product Type: | No Product |

| | |
|---|---|
| Reporting Source: | Broker |
| Employer Name: | MORGAN STANLEY WEALTH MANAGEMENT |
| Termination Type: | Discharged |
| Termination Date: | 06/27/2013 |
| Allegations: | THE EMPLOYEE WAS DISCHARGED AFTER ALLEGATIONS HE MADE INACCURATE STATEMENTS TO AN ANNUITY COMPANY REGARDING A CLIENTS WHEREABOUTS. |
| Product Type: | No Product |

©2013 FINRA. All rights reserved.   Report# 69638-28484 about CHARLES P. WALLACE. Data current as of Wednesday, December 18, 2013.

8

www.finra.org/brokercheck

**End of Report**



**This page is intentionally left blank.**

Exhibit 2

# Award
## NASD Dispute Resolution

In the Matter of the Arbitration Between:

Name of the Claimant                                     Case Number: 01-05703

Philip E. Rosensweig

Name of the Respondent                                   Hearing Site: Boca Raton, Florida

Morgan Stanley DW, Inc.

Nature of Dispute:  Associated Person vs. Member.

## REPRESENTATION OF PARTIES

For Philip E. Rosensweig, hereinafter referred to as "Claimant": Curtis Carlson, Esq., Payton & Carlson, P.A., Miami, Florida.

For Morgan Stanley DW, Inc., hereinafter referred to as "Respondent": Bradford D. Kaufman, Esq. and Timothy W. Schulz, Esq., Greenberg Traurig, P.A., West Palm Beach, Florida.

## CASE INFORMATION

Statement of Claim filed on or about: October 24, 2001.
Claimant signed the Uniform Submission Agreement: October 22, 2001.
Answer and Affirmative Defenses to Statement of Claim filed by Respondent on or about: January 25, 2002.
Respondent signed the Uniform Submission Agreement: January 17, 2002.
Respondent's Dispositive Motion filed on or about: July 3, 2002.
Claimant's Response to Respondent's Dispositive Motion filed on or about:  August 6, 2002.
Claimant's Supplement to the Exhibits to Claimant's Response to Respondent's Dispositive Motion filed on or about:  August 7, 2002.
Respondent's Reply to Claimant's Response to Respondent's Dispositive Motion filed on or about:  August 30, 2002.
Claimant's Motion to Strike Respondent's Reply to Claimant's Response to Respondent's Dispositive Motion filed on or about:  September 25, 2002.
Motion to Limit Claimant's Damages to Those Amounts Stated in Statement of Claim filed by Respondent on or about:  April 29, 2003.
Motion to Strike Claimant's Claim for Damages Based Upon a Loss of Customers and Customer Lists filed by Respondent on or about:  September 8, 2003.
Motion to Re-Open Final Hearing filed by Respondent on or about:  September 25, 2003.
Response to Respondent's Motion to Re-Open Evidence filed by Claimant on or about: October 6, 2003.
Reply to Claimant's Response to Respondent's Motion to Re-Open Evidence filed by Respondent on or about:  October 17, 2003.
Claimant's Memorandum in Response to Respondent's Motion to Re-Open Evidence filed on or about:  November 3, 2003.
Respondent's Reply to Claimant's Memorandum in Response to Respondent's Motion to Re-Open Evidence filed on or about:  November 10, 2003.

NASD Dispute Resolution
Arbitration No. 01-05703
Award Page 2

## CASE SUMMARY

Claimant asserted the following causes of action: breach of employment agreement; breach of equitable and just principles of trade; tortious interference; violation of Florida's Trade Secrets Act; and, conversion. The causes of action relate to Claimant's former employment with Respondent.

Unless specifically admitted in its Answer, Respondent denied the allegations made in the Statement of Claim, asserted various defenses and filed a motion to dismiss the Statement of Claim on the following bases: Claimant could not recover on any theory for wrongful termination; Claimant received all compensation to which he was entitled under Respondent's bonus plans; Claimant's claim of tortious interference failed as a matter of law; Claimant's claim pursuant to Florida's Trade Secrets Act failed as a matter of law; and, Claimant's claim of conversion could not succeed as Claimant's personal property was returned to him.

In response to the motion to dismiss, Claimant denied the assertions therein.

## RELIEF REQUESTED

Claimant requested compensatory damages in the range between $1,000,000.00 and $3,000,000.00, punitive damages, attorney's fees pursuant to Florida's Trade Secrets Act, pre-judgment interest and costs.

Respondent requested dismissal of Claimant's claims.

## OTHER ISSUES CONSIDERED AND DECIDED

During the pre-hearing conference conducted on November 6, 2002, Respondent asserted an objection to Claimant's Motion to Strike Respondent's Reply to Claimant's Response to Respondent's Dispositive Motion. The Panel denied Claimant's Motion to Strike Respondent's Reply to Claimant's Response to Respondent's Dispositive Motion. Thereafter, on or about November 8, 2002, the Panel issued an order which denied Respondent's Dispositive Motion.

During the pre-hearing conference conducted on July 1, 2003, Claimant asserted an objection to Respondent's Motion to Limit Claimant's Damages to Those Amounts Stated in Statement of Claim. On or about July 1, 2003, the Panel issued an order which denied Respondent's Motion to Limit Claimant's Damages to Those Amounts Stated in Statement of Claim.

During the pre-hearing conference conducted on September 12, 2003, Claimant asserted an objection to Respondent's Motion to Strike Claimant's Claim for Damages Based Upon a Loss of Customers and Customer Lists. On or about September 12, 2003, the Panel issued an order which denied Respondent's Motion to Strike Claimant's Claim for Damages Based Upon a Loss of Customers and Customer Lists.

On September 17, 2003, at the close of evidence and immediately prior to closing arguments, Respondent moved to adjourn the evidentiary hearing and requested an opportunity to present

NASD Dispute Resolution
Arbitration No. 01-05703
Award Page 3

additional evidence.   Claimant objected to Respondent's request to adjourn the evidentiary hearing.   Respondent's motion was granted and Respondent was offered two (2) additional hearing dates (December 12-13, 2003) to present evidence.   Respondent, however, chose to use only one (1) additional day (December 12, 2003) and the evidentiary hearing was concluded on that day.

On or about September 25, 2003, Respondent filed a Motion to Re-Open Final Hearing in order to introduce evidence relating to a computer disk.  On or about November 18, 2003, the Panel issued an order which granted Respondent's motion and the documents were admitted into evidence.

The parties have agreed that the Award in this matter may be executed in counterpart copies.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

Respondent is liable to Claimant on the claims of breach of employment agreement, tortious interference and conversion and shall pay to Claimant compensatory damages in the amount of $1,649,860.00, pre-judgment interest specifically excluded.

The Panel recommends expungement from the NASD Central Registration Depository ("CRD") of the Termination Comment "broker was discharged for failure to follow instructions with respect to one account not prompted by a customer complaint, a difference in investment philosophy from the firm and two customer complaints" from Claimant's Form U-5 with respect to Claimant's termination from Morgan Stanley DW, Inc. based on the defamatory nature of the information.   Said Termination Comment shall be changed to "broker was discharged without cause."  In addition the Panel recommends that all documentation in NASD CRD referencing the Morgan Stanley, DW, Inc. discharge be changed such that 1) any "Yes" answers to Questions 14J1 and/or 22N1 submitted on subsequent Form U-4 filings be changed to "No", 2) any Disclosure Reporting Pages be expunged and 3) any other documentation be expunged.

Any and all claims for relief not specifically addressed herein, including Claimant's requests for punitive damages and attorney's fees and Claimant's claim for relief pursuant to Florida's Trade Secrets Act, are denied.

## FEES

Pursuant to the NASD Code of Arbitration Procedure (the "Code"), the following fees are assessed:

### Filing Fees
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:
    Initial claim filing fee                                = $   500.00

NASD Dispute Resolution
Arbitration No. 01-05703
Award Page 4

## Member Fees

Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated person at the time of the events giving rise to the dispute.  In this matter, the member firm is a party.

| | |
|---|---|
| Member surcharge | = $ 2,500.00 |
| Pre-hearing process fee | = $   600.00 |
| Hearing process fee | = $ 4,500.00 |

## Adjournment Fees

No requests for adjournments were filed in this matter.

## Injunctive Relief Fees

No injunctive relief fees were incurred in this matter.

## Forum Fees and Assessments

The Panel has assessed forum fees for each session conducted.  A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less.  Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Two (2) Pre-hearing sessions with a single arbitrator @ $450.00 | | = $   900.00 | |
| Pre-hearing conferences: | January 23, 2003 | 1 session | |
| | July 28, 2003 | 1 session | |
| | | | |
| Four (4) Pre-hearing sessions with the Panel @ $1,200.00 | | = $ 4,800.00 | |
| Pre-hearing conferences: | April 30, 2002 | 1 session | |
| | November 6, 2002 | 1 session | |
| | July 1, 2003 | 1 session | |
| | September 12, 2003 | 1 session | |
| | | | |
| Seven (7) Hearing sessions @ $1,200.00 | | = $ 8,400.00 | |
| Hearing Dates: | September 15, 2003 | 2 sessions | |
| | September 16, 2003 | 2 sessions | |
| | September 17, 2003 | 2 sessions | |
| | December 12, 2003 | 1 session | |

| | |
|---|---|
| Total Forum Fees | = $14,100.00 |

The Panel has assessed $7,050.00 of the forum fees to Claimant.
The Panel has assessed $7,050.00 of the forum fees to Respondent.

## Administrative Costs

Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services.  These include, but are not limited to: additional copies of arbitrator awards; copies of audio transcripts; retrieval of documents from archives; interpreters; and, security.

NASD Dispute Resolution
Arbitration No. 01-05703
Award Page 5

No administrative costs were incurred in this matter.

## FEE SUMMARY

Claimant is solely liable for:
    Initial Filing Fee               = $   500.00
    Forum Fees                 = $ 7,050.00

    Total Fees                 = $ 7,550.00
    Less payments           = $ 3,200.00

    Balance Due NASD Dispute Resolution    = $ 4,350.00

Respondent is solely liable for:
    Member Fees              = $ 7,600.00
    Forum Fees                 = $ 7,050.00

    Total Fees                 = $14,650.00
    Less payments           = $ 7,600.00

    Balance Due NASD Dispute Resolution    = $ 7,050.00

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

## ARBITRATION PANEL

William Kent Brown, Esq.    -    Public Arbitrator, Presiding Chair
Michael D. Hamilton    -    Public Arbitrator
Joel H. Holzer    -    Non-Public Arbitrator

NASD Dispute Resolution
Arbitration No. 01-05703
Award Page 6

## Concurring Arbitrators' Signatures

/s/                                                    12/26/03
_____          _____
William Kent Brown, Esq.                           Signature Date
Public Arbitrator, Presiding Chair


/s/                                                    12/25/03
_____          _____
Michael D. Hamilton                                Signature Date
Public Arbitrator


/s/                                                    12/24/03
_____          _____
Joel H. Holzer                                     Signature Date
Non-Public Arbitrator

12/29/03
_____
Date of Service   (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 01-05703
Award Page 6


<u>Concurring Arbitrators' Signatures</u>


_____          Signature Date
William Kent Brown, Esq.
Public Arbitrator, Presiding Chair

*Michael D Hamilton*                    **12-25-2003**
Michael D. Hamilton                     Signature Date
Public Arbitrator


_____          Signature Date
Joel H. Holzer
Non-Public Arbitrator


_____
Date of Service  (For NASD Dispute Resolution office use only)

Arbitration No. 01-05703
Award Page 6

## Concurring Arbitrators' Signatures

William Kent Brown, Esq.
Public Arbitrator, Presiding Chair

12/26/03
Signature Date

Michael D. Hamilton
Public Arbitrator

Signature Date

Joel H. Holzer
Non-Public Arbitrator

Signature Date

Date of Service  (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 01-05703
Award Page 6

**Concurring Arbitrators' Signatures**

William Kent Brown, Esq.
Public Arbitrator, Presiding Chair

Signature Date

Michael D. Hamilton
Public Arbitrator

Signature Date

Joel H. Holzer
Non-Public Arbitrator

12/2/03
Signature Date

Date of Service   (For NASD Dispute Resolution office use only)

Exhibit 3

# Award
## NASD Dispute Resolution

In the Matter of the Arbitration Between:

Name of the Claimant
Morgan Stanley & Co., Incorporated

Case Number: 02-04012

Name of the Respondent
Oscar Daniel Melhem Marcote

Hearing Site: Boca Raton, Florida

Name of the Third Party Respondent
Dean C. Klevan

Nature of the Dispute:  Member vs. Associated Person vs. Associated Person.

## REPRESENTATION OF PARTIES

For Morgan Stanley & Co., Incorporated ("MS&CI"), hereinafter referred to as "Claimant":
Michael S. Taaffe, Esq., Abel, Band, Russell, Collier, Pitchford & Gordon, Chartered,
Sarasota, Florida.

For Oscar Daniel Melhem Marcote ("Marcote"), hereinafter referred to as "Respondent":
Ronald Shindler, Esq., Fowler, White Burnett P.A., Miami, Florida.

For Dean C. Klevan ("Klevan"), hereinafter referred to as "Third Party Respondent":  Holly
Skolnick, Esq., Greenberg Traurig, P.A.,  Miami, Florida.

## CASE INFORMATION

Statement of Claim filed on or about:  July 9, 2002.
Claimant signed the Uniform Submission Agreement:  April 24, 2002.
Amended Statement of Claim filed on or about:  December 16, 2002.
Statement of Answer, Counterclaim and Third Party Claim filed by Respondent on or about:
October 11, 2002.
Respondent signed the Uniform Submission Agreement:  August 24, 2002.
Statement of Answer to Counterclaim filed by Claimant on or about:  October 25, 2002.
Statement of Answer filed by Third Party Respondent on or about:  January 8, 2003.
Third Party Respondent signed the Uniform Submission Agreement:  December 5, 2002.
Motion to Dismiss Counterclaim filed by Claimant on or about:  August 5, 2003.
Opposition to Claimant's Motion to Dismiss Counterclaim filed by Respondent on or about:
August 29, 2003.

## CASE SUMMARY

Claimant asserted the following causes of action:  1) breach of contract - Promissory Note; 2) breach of contract - Employment Agreement; 3) violation of Florida Uniform Trade Secrets Act; 4) tortious interference with business relations; 5) defamation; and 6) breach of contract/indemnity - Memorandum Agreement.  The causes of action relate to Respondent's employment with Claimant and agreements executed in connection therewith.

Unless specifically admitted in his Answer, Respondent denied the allegations made in the Statement of Claim and asserted various defenses.  In his Counterclaim and Third Party Claim, Respondent asserted the following causes of action:  1) fraudulent inducement; 2) wrongful termination; and 3) defamation.

Unless specifically admitted in its Answer to the Counterclaim, Claimant denied the allegations made in the Counterclaim and asserted various defenses.

Unless specifically admitted in his Answer to the Third Party Claim, Third Party Respondent denied the allegations made in the Third Party Claim and asserted various defenses.

## RELIEF REQUESTED

Claimant requested compensatory damages of $385,500.00 pursuant to the Promissory Note, compensatory damages of $44,978.50 pursuant to the terms of the Memorandum Agreement, as well as other unspecified compensatory damages, plus interest, attorney's fees, the costs of this proceeding including forum and hearing fees, and such other relief as is deemed just and proper.  In addition, Claimant request a preliminary and permanent injunction preventing Respondent from soliciting Claimant's clients and making use of Claimant's confidential information to contact clients, and an injunction ordering Respondent to return all of Claimant's documents and confidential information.  In addition, Claimant requested that all claims set forth in the Counterclaim against it be dismissed.

Respondent requested that all claims against him be dismissed with prejudice.  In his Counterclaim and Third Party Claim, Respondent requested compensatory damages of $5,000,000.00, plus punitive damages of $15,000,000.00, attorney's fees, the costs of this proceeding and such other relief as is deemed just and proper.

Third Party Respondent requested that all claims set forth in the Third Party Claim against him be dismissed.

## OTHER ISSUES CONSIDERED AND DECIDED

By Order dated October 16, 2003, the undersigned arbitrators (the "Panel") granted Claimant's Motion to Dismiss Counterclaim with respect to paragraphs 14 and 19 (iv) of Respondent's Counterclaim.  Paragraph 14 referred to Respondent's assertion that the filing of this arbitration resulted in his then employer asking him to resign.  Paragraph 19 (iv) included

a cause of action for lost opportunity to earn a livelihood.

On or about October 14, 2003, Respondent Marcote advised NASD Dispute Resolution that he had reached an agreement which resolved his dispute with Third Party Respondent Klevan and further advised that he was dismissing his Third Party Claim with prejudice.

On or about October 15, 2003, Claimant advised NASD Dispute Resolution that in light of Respondent's dismissal of its Third Party Claim, Claimant was withdrawing its claims for: 1) breach of contract - employment agreement; 2) violation of Florida Uniform Trade Secrets Act; 3) tortious interference with business relations; and 4) defamation.

## AWARD

After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions (if any), the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondent is liable and shall pay to Claimant the sum of $44,978.50 in compensatory damages for Respondent's breach of contract of the Memorandum Agreement entered into as a result of Respondent's trading error. Pre and post judgment interest are not awarded on this sum.

2. Claimant is liable on the Counterclaim and shall pay to Respondent the sum of $1,750,000.00 as compensatory damages.  Damages are awarded based upon Claimant's termination of Respondent without reasonable cause and Claimant's defamation of Respondent which occurred as a direct result of Claimant's negligent failure to supervise its employees.

3. Claimant is liable on the Counterclaim and shall pay to Respondent the sum of $155,730.00 in compensatory damages. These damages are awarded based upon Claimant's wrongful termination of Respondent which resulted in a breach of the employment agreement and a breach of promised loans pursuant to the employment agreement.

4. Claimant shall forgive the first loan made to Respondent in the principal sum of $385,500.00 along with any accrued interest.

5. Claimant is entitled to a set off of the amount awarded against it in the amount of $44,978.50 representing the damages awarded to Claimant.

6. Claimant is liable and shall pay to Respondent interest at the Florida statutory rate on the compensatory damages awarded herein to Respondent from December 10, 2003 until the date of payment of all amounts awarded.

7. For purposes of any determination of attorney's fees by a court of competent jurisdiction, it has been determined by this Panel that the Respondent is the prevailing party pursuant to the parties' Memorandum Agreement and Employment Agreement.

8. Any and all claims for relief not specifically addressed herein, including Respondent's claim for punitive damages, are denied.

NASD Dispute Resolution
Arbitration No. 02-04012
Award   Page 4

## FEES

Pursuant to the NASD Code of Arbitration Procedure (the "Code"), the following fees are assessed:

### Filing Fees
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

| | |
|---|---|
| Initial claim filing fee | = $1,000.00 |
| Counterclaim/Third Party Claim filing fee | = $ 600.00 |

### Member Fees
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm that employed the associated persons at the time of the events giving rise to the dispute.  Accordingly, MS&CI is a member firm and a party.

| | |
|---|---|
| Member surcharge | = $1,700.00 |
| Pre-hearing process fee | = $ 750.00 |
| Hearing process fee | = $5,500.00 |

### Adjournment Fees
No adjournments were granted during these proceedings for which fees were assessed.

### Injunctive Relief Fees
Injunctive relief fees are assessed to each member or associated person who files for a temporary injunction in court.  Parties in these cases are also assessed arbitrator travel expenses and costs when an arbitrator is required to travel outside his or her hearing location and additional arbitrator honoraria for the hearing for permanent injunction.  These fees, except the injunctive relief surcharge, are assessed equally against each party unless otherwise directed by the panel.

No injunctive relief fees were incurred during this proceeding.

### Forum Fees and Assessments
The Panel has assessed forum fees for each session conducted.  A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less.  Fees associated with these proceedings are:

| | | |
|---|---|---|
| One (1)  Pre-hearing session with a single arbitrator @ $450.00 | = $   450.00 | |
| Pre-hearing conference: August 1, 2003 | 1 session | |

| | | |
|---|---|---|
| Three (3)  Pre-hearing sessions with the Panel @ $1,200.00 | = $ 3,600.00 | |
| Pre-hearing conferences: February 12, 2003 | 1 session | |
| October 10, 2003 | 1 session | |
| November 20, 2003 | 1 session | |

| | |
|---|---|
| Fifteen (15)  Hearing sessions @ $1,200.00 | = $18,000.00 |

NASD Dispute Resolution
Arbitration No. 02-04012
Award   Page 5

| Hearing Dates: | October 20, 2003 | 2 sessions |
|---|---|---|
| | October 21, 2003 | 2 sessions |
| | October 22, 2003 | 3 sessions |
| | October 23, 2003 | 3 sessions |
| | December 8, 2003 | 2 sessions |
| | December 9, 2003 | 2 sessions |
| | December 10, 2003 | 1 session |

| Total Forum Fees | = $22,050.00 |
|---|---|

The Panel has assessed $11,025.00 of the forum fees to Claimant.
The Panel has assessed $11,025.00 of the forum fees to Respondent.

## Administrative Costs

Administrative costs are expenses incurred due to a request by a party for special services beyond the normal administrative services.  These include, but not limited to, additional copies of arbitrator awards, copies of audio transcripts, retrieval of documents from archives, interpreters, and security.

No administrative fees were incurred during this proceeding.

## Fee Summary

Claimant is solely liable for:

| | |
|---|---|
| Initial Filing Fee | = $ 1,000.00 |
| Member Fees | = $ 7,950.00 |
| Forum Fees | = $11,025.00 |
| Total Fees | = $19,975.00 |
| Less payments | = $ 7,325.00 |
| Balance Due NASD Dispute Resolution | = $12,650.00 |

Respondent is solely liable for:

| | |
|---|---|
| Counterclaim/Third Party Claim Filing Fee | = $  600.00 |
| Forum Fees | = $11,025.00 |
| Total Fees | = $11,625.00 |
| Less payments | = $ 1,800.00 |
| Balance Due NASD Dispute Resolution | = $ 9,825.00 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

## ARBITRATION PANEL

| James A. Smith, IV | - | *Public Arbitrator, Presiding Chairperson* |
|---|---|---|
| David M. Auerbach | - | *Public Arbitrator* |
| Shirley A. Castle | - | *Non-Public Arbitrator* |

NASD Dispute Resolution
Arbitration No. 02-04012
Award   Page 6

## Concurring Arbitrators' Signatures

_____/s/_____
James A. Smith, IV                          Signature Date
Public Arbitrator, Presiding Chairperson


_____/s/_____
David M. Auerbach                           Signature Date
Public Arbitrator


_____/s/_____
Shirley A. Castle                           Signature Date
Non-Public Arbitrator


January 8, 2004
Date of Service  (For NASD Dispute Resolution office use only)

NASD Dispute Resolution
Arbitration No. 02-04012
Award  Page 6

**Concurring Arbitrators' Signatures**

James A. Smith, IV
Public Arbitrator, Presiding Chairperson

1/8/2004
Signature Date

David M. Auerbach
Public Arbitrator

Signature Date

Shirley A. Castle
Non-Public Arbitrator

Signature Date

Date of Service  (For NASD Dispute Resolution office use only)

Arbitration No. 02-04012
Award   Page 6

Concurring Arbitrators' Signatures

_____                    _____
James A. Smith, IV                          Signature Date
Public Arbitrator, Presiding Chairperson

_____                    January 8, 2004
David M. Auerbach                           Signature Date
Public Arbitrator

_____                    _____
Shirley A. Castle                           Signature Date
Non-Public Arbitrator

_____
Date of Service   (For NASD Dispute Resolution office use only)

Arbitration No. 02-04012
Award  Page 6


Concurring Arbitrators' Signatures


_____
James A. Smith, IV                                          Signature Date
Public Arbitrator, Presiding Chairperson


_____
David M. Auerbach                                          Signature Date
Public Arbitrator

_Shirley A. Castle_                                          _7-8-04_
Shirley A. Castle                                          Signature Date
Non-Public Arbitrator


_____
Date of Service   (For NASD Dispute Resolution office use only)

Exhibit 4

## PROTOCOL FOR BROKER RECRUITING

The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms. If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding." The signatories to this protocol agree to implement and adhere to it in good faith.

When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information: client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information. Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her. The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR. The local branch management will send the information to the firm's back office. In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her.

To ensure compliance with GLB and SEC Regulation SP, the new firm will limit the use of the Client Information to the solicitation by the RR of his or her former clients and will not permit the use of the Client Information by any other RR or for any other purpose. If a former client indicates to the new firm that he/she would like the prior firm to provide account number(s) and/or account information to the new firm, the former client will be asked to sign a standardized form authorizing the release of the account number(s) and/or account information to the new firm before any such account number(s) or account information are provided.

The prior firm will forward to the new firm the client's account number(s) and/or most recent account statement(s) or information concerning the account's current positions within one business day, if possible, but, in any event, within two business days, of its receipt of the signed authorization. This information will be transmitted electronically or by fax, and the requests will be processed by the central back office rather than the branch where the RR was employed. A client who wants to transfer his/her account need only sign an ACAT form.

WFES08731

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm.

The RR's former firm is required to preserve the documents associated with each account as required by SEC regulations or firm record retention requirements.

It shall not be a violation of this protocol for an RR, prior to his or her resignation, to provide another firm with information related to the RR's business, other than account statements, so long as that information does not reveal client identity.

Accounts subject to a services agreement for stock benefits management services between the firm and the company sponsoring the stock benefit plan that the account holder participates in (such as with stock option programs) would still be subject to (a) the provisions of that agreement as well as to (b) the provisions of any account servicing agreement between the RR and the firm. Also, accounts subject to a participation agreement in connection with prospecting IRA rollover business would still be subject to the provisions of that agreement.

If an RR is a member of a team or partnership, and where the entire team/partnership does not move together to another firm, the terms of the team/partnership agreement will govern for which clients the departing team members or partners may take Client Information and which clients the departing team members or partners can solicit. In no event, however, shall a team/partnership agreement be construed or enforced to preclude an RR from taking the Client Information for those clients whom he or she introduced to the team or partnership or from soliciting such clients.

In the absence of a team or partnership written agreement on this point, the following terms shall govern where the entire team is not moving. (1) If the departing team member or partner has been a member of the team or partnership in a producing capacity for four years or more, the departing team member or partner may take the Client Information for all clients serviced by the team or partnership and may solicit those clients to move their accounts to the new firm without fear of litigation from the RR's former firm with respect to such information and solicitations. (2) If the departing team member or partner has been a member of the team or partnership in a producing capacity for less than four years, the departing team member or partner will be free from litigation from the RR's former firm with respect to client solicitations and the Client Information only for those clients that he or she introduced to the team or partnership.

If accounts serviced by the departing RR were transferred to the departing RR pursuant to a retirement program that pays a retiring RR trailing commissions on the accounts in return for certain assistance provided by the retiring RR prior to his or her retirement in transitioning the accounts to the departing RR, the departing RR's ability to take Client Information related to those accounts and the departing RR's right to solicit those ac-

-2-

counts shall be governed by the terms of the contract between the returning RR, the departing RR, and the firm with which both were affiliated

A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto  A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory  The protocol will remain in full force and effect with respect to those signatories who have not withdrawn

Citigroup Global Markets Inc  ("Smith Barney")

By _____

Name    Kevin McManus

Title    Managing Director and Chief
Administrative Officer, Private
Client Branch System

Merrill Lynch, Pierce, Fenner & Smith Incorporated

By _____

Name    Phil Sieg

Title    Managing Director, Head of Strategic
Leadership and Development

UBS Financial Services Inc

By _____

Name    Barry Buchsbaum

Title    Director of Strategic Development
Executive Vice President

-3-

counts shall be governed by the terms of the contract between the retiring RR, the de- parting RR, and the firm with which both were affiliated

A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto  A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory  The protocol will remain in full force and effect with respect to those signatories who have not withdrawn

AGREED AND ACCEPTED THIS 19TH DAY OF AUGUST, 2004

STEPHENS INC

By _David Knight_
Name David Knight
Title  Executive Vice President
         General Counsel

<u>JOINDER AGREEMENT FOR BROKER PROTOCOL</u>

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned company hereby joins and becomes a party to the Protocol for Broker Recruiting and agrees to be bound by the terms of, and perform its obligations under, the Protocol for Broker Recruiting.

Dated as of the _2nd_ day of March, 2005.

UBS INTERNATIONAL INC.

By: _____
Name: _Rudolf A. Gonzalez, Jr._
Title: _CEO_

By: _____
Name: _Scott Noah_
Title: _Executive Director_

WW304997v1

JOINDER AGREEMENT FOR BROKER PROTOCOL

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned company hereby joins and becomes a party to the Protocol for Broker Recruiting and agrees to be bound by the terms of, and perform its obligations under, the Protocol for Broker Recruiting.

Dated as of the 10 day of January, 2006.

WACHOVIA SECURITIES LLC

By: _____

Name: ELLEN T. WALKER, II. "CHIP"

Title: MANAGING DIRECTOR, PA INTEGRATION

W9045597v1

## JOINDER AGREEMENT FOR BROKER PROTOCOL

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned company hereby joins and becomes a party to the Protocol for Broker Recruiting and agrees to be bound by the terms of, and perform its obligations under, the Protocol for Broker Recruiting.

Dated as of the 6th day of October , 2006.

MORGAN STANLEY DW INC.

By: _____
Name:   Andy Saperstein
Title:    Managing Director

WF904937v1

## JOINDER AGREEMENT FOR BROKER PROTOCOL

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned company hereby joins and becomes a party to the Protocol for Broker Recruiting and agrees to be bound by the terms of, and perform its obligations under, the Protocol for Broker Recruiting.

Dated as of the 1st day of March, 2007

A G Edwards & Sons, Inc

[NAME OF FIRM]

By _____

Name

Title  E V P

JOINDER AGREEMENT FOR BROKER PROTOCOL

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned company hereby joins and becomes a party to the Protocol for Broker Recruiting and agrees to be bound by the terms of, and perform its obligations under, the Protocol for Broker Recruiting.

Dated as of the 7th day of August, 2007.

[Received on October 9, 2007]

The Retirement Planning Group, Inc.
7400 College Blvd. Ste. 105
Overland Park KS 66210

By: _____
Name: Chris K. Costello
Title: CEO

W904997v1

NOV. 20. 2007  5:10PM    CREDIT SUISSE                    NO. 1080   P. 3

## JOINDER AGREEMENT FOR BROKER PROTOCOL

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned company hereby joins and becomes a party to the Protocol for Broker Recruiting and agrees to be bound by the terms of, and perform its obligations under, the Protocol for Broker Recruiting.

Dated as of the 1́4 day of _NOV_, 2007.

Credit Suisse Securities (USA) LLC

By: _____
Name:  Anthony DeChellis
Title:   Managing Director and
Head of Private Banking Americas

Exhibit 5

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| | Paula Dumas v. Donald L Hagan, LLC, d/b/a Day Hagan Asset Management, and Gordon E. Jones, FINRA Case No. 11-02369 | July 12, 2013 | Claimant asserted the following causes of action: 1) breach of contract against Respondent Day Hagan, 2) tortious interference with business relationships against Respondent Day Hagan, 3) conversion against Respondent Day Hagan, 4) wrongful termination against Respondent Day Hagan, 5) defamation per se against both Respondents, and 6) breach of contract against Respondent Jones. The causes of action relate to the termination of Claimant's employment with Respondent Day Hagan and the termination of a contractual relationship between Claimant and Respondent Jones. In their Counterclaims, Respondents asserted the following causes of action: 1) breach of contract against Claimant by Respondent Day Hagan, 2) unjust enrichment against Claimant by Respondent Day Hagan, and 3) breach of contract against Claimant by Respondent Jones. The causes of action relate to Claimant's alleged failure to properly service customer accounts and failure to pay for office space and associated services. | On the cause of action of breach of contract, Respondents are liable, jointly and severally, to Claimant for compensatory damages in the sum of $50,000.00, prejudgment interest specifically denied. Post-judgment interest, if any, shall accrue in accordance with the Code. On the cause of action of breach of contract, Claimant is liable to Respondents for compensatory damages in the sum of $14,680.98, pre-judgment interest specifically denied. Post-judgment interest, if any, shall accrue in accordance with the Code. Respondents' award ($14,680.98) is to be subtracted from Claimant's award ($50,000.00). Accordingly, Respondents shall pay to Claimant the sum of $35,319.02 and Claimant shall pay nothing to Respondents. |
| | Popular Securities, Inc. v. Gustavo Del Valle Pagan, Sara M. Sanchez, and the Conjugal Partnership, FINRA Case No. 12-01668 | July 25, 2013 | The cause of action relates to Respondent Pagan's alleged failure to repay sums due Claimant upon Respondent Pagan's termination of employment pursuant to the terms of a fully executed promissory note dated April 4, 2006. In his Counterclaim, Respondent Pagan asserted the causes of action of misrepresentation, breach of promises and wrongful termination. | Claimant's demand for repayment of the Note is denied in its entirety. With respect to Respondent Pagan's Counterclaim, Claimant is liable for wrongful termination and shall pay to Respondent Pagan compensatory damages in the total amount of $80,000.00 plus interest. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| | Cambridge Investment Research, Inc. v. Henry Mark Korngut, FINRA Case No. 12-01115 | August 9, 2013 | Claimant asserted the following causes of action: breach of employment promissory notes. The cause of action relates to the alleged breach of contracts involving promissory notes (Registered Representative Agreement, Forgivable Note, and Installment Note) executed by Claimant and Respondent. In the Amended Statement of Answer and Counterclaim, Respondent asserted the following causes of action: violation of covenant of good faith and fair dealing; intentional interference with prospective economic advantage; violation of labor code; and defamation. | Respondent is liable for and shall pay to Claimant the amount of $22,266.42 in compensatory damages. Claimant is liable for and shall pay to Respondent compensatory damages in the amount of $160,000.00, on claims for defamation and breach of Registered Representative Agreement. Claimant's award in the amount of $22,266.42 is an offset to Respondent's award. Accordingly, Respondent's obligation is extinguished by the offset. As such, Claimant is liable for and shall pay to Respondent compensatory damages in the net sum of $137,733.58. |
| | David Schrohe v. UBS Financial Services, Inc., FINRA Case No. 12-00565 | August 15, 2013 | In the Statement of Claim, Claimant asserted the following causes of action: breach of contract, breach of implied contract, quantum meruit-unjust enrichment, promissory estoppel; violation of New Jersey labor law, and wrongful termination. | Respondent is liable for and shall pay to Claimant compensatory damages in the amount of $100,000.00. |
| | Ben B. Brissi v. Forefront Capital Markets, LLC, Bradley Carl Reifler, David Allan Wasitowski, Forefront Capital Management, LLC, Forefront Management Group, LLC, and Christopher E. Engel, FINRA Case No. 12-04247 | October 24, 2013 | Claimant asserted the following causes of action: breach of contract, compensation, slander, wrongful termination, and indemnification. | Forefront Capital Markets, LLC, Reifler, Forefront Capital Management, LLC, and Forefront Management Group, LLC are jointly and severally liable for and shall pay to Claimant compensatory damages in the amount of $27,385.78. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| | Wilfredo Ortiz-Aponte v. RD Capital Group, Inc., FINRA Case No. 11-01843 | November 11, 2013 | In the Statement of Claim, Claimant asserted the following causes of action: unjust and wrongful discharge, retaliation, defamation and libel, unpaid Christmas bonuses and illegal deduction to Claimant's payroll. The causes of action relate to the termination of Claimant's employment with Respondent. | Respondent is liable and shall pay to Claimant compensatory damages in the sum of $15,140.00. |
| | Lawrence Wilkerson v. IMS Securities, Inc., FINRA Case No. 12-03249 | November 27, 2013 | Claimant asserted the following causes of action: negligence; failure to supervise; and defamation. The causes of action related to Claimant's allegations that Respondent failed to properly review the trades that Claimant incorrectly entered before they were executed. Claimant alleged that Respondent failed to ask any questions about the trades and refused to cancel them, which resulted in a loss in a client's account. Furthermore, Claimant alleged that Respondent fired him and negligently published a defamatory libelous statement on his Form U5. | Respondent, IMS Securities, Inc., is liable for and shall pay to Claimant, Lawrence Wilkerson, the sum of $35,000.00 in compensatory damages; The Arbitrator recommends that the Reason for Termination in the Form U5 of Claimant Lawrence Wilkerson (CRD No. 467092) filed by IMS Securities, Inc. on August 1, 2012 and maintained by the Central Registration Depository (CRD) be expunged and changed to "Voluntary." The current Termination Comment should be expunged and replaced with "Retiring." |
| 1 | Newport Coast Securities, Inc. v. Deborah Ann Scott v. Joseph Mangiapane, Jr., Kathleen Margaret McPherson, and Stephen Paul Washburn, FINRA Case No. 11-03419 | February 20, 2013 | Newport Coast sought damages in an amount equivalent to the amount of monetary sanctions levied and what will likely be levied against the firm by FINRA for conduct that allegedly occurred due to Scott's failure to perform her supervisory and compliance responsibilities during the period Scott was President and/or Chief Compliance Officer of Newport Coast. Scott made claims for wrongful termination in violation of public policy, fraud, negligent misrepresentation, conspiracy to retaliate and wrongfully terminate, breach of contract, defamation, including libel per se, breach of implied covenant of good faith and fair dealing, unlawful age discrimination, and negligence. | Newport Coast, Mangiapane, McPherson, and Washburn are jointly and severally liable and shall pay Scott $300,000 in compensatory damages, $125,863 in attorneys' fees, and interest. The Panel also awarded expungement. |

| No. | Case Name and No. | Date | Description | Holding |
|-----|-------------------|------|-------------|---------|
| 2 | Donald Anthony Wojnowski, Jr. v. Anderson Strudwick, Incorporated, Gordon Lee Crenshaw, II, Donald Hale Newlin, and Milton Turner v. James Todd Newton, FINRA Case No. 11-03029 | January 22, 2013 | Claimant asserted claims for wrongful termination, fraud in the inducement, and breach of contract. | Respondent Anderson & Strudwick is found liable and shall pay Claimant compensatory damages in the amount of $80,000. |
| 3 | Lucy Patriarca v. C.L. King & Associates, Inc., Peter Edward Bulger, and Louis A Parks, FINRA Case No. 11-03524 | November 16, 2012 | Claimant asserted claims for retaliation for forcing Respondents to continue to accommodate restrictions of Claimant's disability, failure to investigate and take corrective action, failure to reasonably accommodate the restrictions of Claimant's disability, and wrongful discharge. | The Panel found Claimant was retaliated against based upon her disability complaints.  The Panel awarded the Claimant $46,937 for back pay, $93,873 for front pay, $20,000 for emotional distress, $122,463 for attorneys' fees, and $8,500 for costs, and expungement. |
| 4 | Merrill Lynch, Pierce, Fenner & Smith, Incorporated v. Barbara Jean Horvarth, FINRA Case No. 11-00911 | October 23, 2012 | Merrill Lynch asserted a claim for $418,344 on a promissory note, Horvarth counterclaimed for wrongful termination, breach of implied covenant of good faith and fair dealing, intentional interference with contractual relations, intentional interference with prospective economic advantage, breach of contract, unlawful, deceptive and/or unfair business practices, and | Hovarth is liable to Merrill for $418,344 plus interest of $20,523, and Merill is liable to Hovarth for $1,235,000, the two offset for a total of Merrill owing Horvarth $796,132.  The Panel also awarded expungement. |
| 5 | Ephraim B. Finkelstein v. Cantor Fitzgerald & Co., FINRA Case No. 11-02382 | September 20, 2012 | Claimant asserted claims for breach of contract, breach of implied contract, quantum meruit, unjust enrichment, promissory estoppel, labor law, and wrongful termination. | Respondent is liable for and shall pay to Claimant compensatory damages in the amount of $225,000 plus interest accruing from March 15, 2010.  Respondent is liable and shall pay to Claimant deferred compensation in the amount of $8,750. |
| 6 | Frederick Clifford Blanchard v. Bostonia Global Securities, LLC, FINRA Case No. 11-04150 | September 19, 2012 | Claimant asserted claims for wrongful termination, violation of the Massachusetts Wage Act, and breach of the implied covenant of good faith and fair dealing. | Respondent is liable for and shall pay compensatory damages in the amount of $27,500. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 7 | James P. Gibbs v. Valic Financial Advisors, Inc. f/k/a AIG Retirement Advisors, Inc. and Max K. Aten, FINRA Case No. 10-05681 | June 21, 2012 | Claimant asserted claims for wrongful termination, tortious interference with employment expectancy by VFA, and tortious interference with employment expectancy by Aten. | Respondent Valic Financial Advisors is liable and shall pay to Claimant the sum of $80,000 in compensatory damages. |
| 8 | UBS Financial Services Inc. v. Gustavo A. Del Valle, FINRA Case No. 11-01520 | June 15, 2012 | UBS asserted claims for failure to repay sums due pursuant to a promissory note.  Gustavo, in his counterclaim, alleged wrongful termination, retaliation to whistleblowing, and disability discrimination pursuant to the American with Disabilities Act 42 U.S.C. 12101, and disability discrimination pursuant to Puerto Rico Statute 1 L.P.R.A. 501. | Gustavo shall pay $49,556 plus interest of $3,988 to UBS, and UBS must pay $300,000 to Gustavo for compensatory damages and $300,000 exemplary damages as provided by Puerto Rico Law 80 due to the unjustified dismissal of Gustavo and for punishing UBS for whistleblowing. |
| 9 | Morgan Keegan & Company, Inc. v. Alejandro Rotundo v. Jose de la Lama and Michel Rittenberg, FINRA Case No. 10-04775 | May 7, 2012 | Morgan Keegan asserted claims for failure to repay sums due pursuant to a promissory note. Rotundo counterclaimed for defamation, breach of employment contract, declaratory relief, breach of equitable and just principals of trade, tortious interference with advantageous business relationship, and unjust enrichment. | The panel determined that the language [on the U-5] was inappropriate and proximately caused damages to Rotundo...an award is made in favor of Rotundo in the amount of $500,000 plus interest from the date of the award.  The Panel also recommended expungement. |
| 10 | Nicole Alise Cannava v. Merrill Lynch Pierce Fenner & Smith, Inc., FINRA Case No. 11-00145 | April 26, 2012 | Claimant asserted claims for libel on Form U5 and wrongful termination. | Respondent is liable for and shall pay to Claimant compensatory damages in the amount of $68,117. The Panel also awarded expungement. |
| 11 | Merrill Lynch, Pierce, Fenner & Smith, Incorporated v. Angel E. Aquino | June 14, 2011 | Merrill Lynch asserted a claim based on a promissory note.  Aquino counterclaimed with claims for breach of contract, termination without cause, and expungement on the Form U-5.  The causes of action relate to Claimant's alleged failure to act in good faith under the parties' agreement and alleged defamatory language in Respondent's Form U-5. | Merrill is liable on the counterclaim and shall pay to Respondent compensatory damages in the amount of $1,546,247, for the defamatory nature of the information placed in his CRD record.  The Panel also awarded expungement.  Merrill was not able to rely on its defense that Respondent was an at-will employee. |

| No. | Case Name and No. | Date | Description | Holding |
|-----|-------------------|------|-------------|---------|
| 12 | Iliana Perales v. Chase Investment Services Corp and Chase Bank | June 6, 2011 | Claimant asserted claims for defamation and wrongful termination. | Respondent is liable and shall pay Claimant $75,000 in compensatory damages on the defamation claim. The Panel also awarded expungement. The expungement language acknowledged that Perales was an at-will employee. |
| 13 | Wells Fargo Investments, LLC v. Kenneth C. Shaffer, FINRA Case No. 10-00773 | January 18, 2011 | Wells Fargo sued on promissory note, Shaffer counterclaimed for wrongful termination, libel and slander on his Form U-5, among other claims. | Panel recommends expungement of the termination comment. Wells Fargo Investments is liable for and shall pay $75,000 compensatory damages as a result of the defamatory nature of the Form U5 Termination Explanation. Broker doesn't have to pay back promissory note either which was worth $74,617. |
| 14 | Ronee S. Mills v. Scottrade, Inc., FINRA Case No. 09-02988 | January 5, 2011 | Claimant asserted a claim for wrongful discharge without good cause and wrongful discharge in violation of written policies. | Scottrade is liable to and shall pay Mills $562,670 for wrongful termination under the WDEA, plus $6,757 in fees. "When a discharge is not for an honest reason but rather a pretext for some other illegitimate reason, it is a violation of Montana law and the WDEA. |
| 15 | Michelle L. Ford v Affinity Investment Services, LLC, Affinity Federal Credit Union, Affinity Financial Services, LLC, and Mark Dubel, FINRA Case No. 08-02782 | October 13, 2010 | Claimant asserted claims for wrongful discharge and defamation among others. | Panel recommended expungement of U-5 based on its defamatory language, and awarded $825,000 in compensatory damages with interest until paid in full. |
| 16 | NRP Financial, Inc., National Retirement Partners, Inc., and NRP Advisors, Inc. vs. Walker Bafs Retirement Group, Inc., Wade Alan Walker, and Jeffrey Brian Bafs, FINRA Case No. 09-03246 | July 20, 2010 | Firm sued brokers for breach of fiduciary duty, breach of contract, promissory fraud, intentional misrepresentation, and intentional interference with contract. Respondents counterclaimed for wrongful termination, theft of clients, defamation, and defamation by implication. | Panel denied and dismissed firm's claims and awarded respondent Walker $500,000 and respondent Bafs $1,000,000 in compensatory damages on their counterclaims. In addition they also won over $500,000 in attorneys fees and costs for their counterclaim. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 17 | Scott Skinner v. Merrill Lynch, Pierce, Fenner & Smith Inc. | July 14, 2010 | Claimant asserted claims for defamation, wrongful termination, breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with prospective business advantage, and violations of FINRA rules. | Respondent is liable for $173,771 in compensatory damages for deferred compensation, $85,000 for punitive damages, and $20,000 for attorneys' fees. Merill raised the Texas employment "at-will" doctrine as a defense. |
| 18 | Alvin H. Shrago vs. Deutsche Bank Securities, Inc., FINRA Case No. 09-00770 | June 15, 2010 | Claimant asserted a claim for wrongful termination among other things. | Respondent is liable and shall pay to Claimant compensatory damages in the amount of $450,000 plus pre-judgment interest at 8% per annum accruing from January 3, 2009 to June 1, 2010. |
| 19 | Larry J. Osborne v. Chase Investment Services Corp., and Steven Campbell, FINRA Case No. 08-02674 | June 9, 2010 | Claimant asserted claims for wrongful termination and defamation among other things. | Respondent is liable and shall pay to Claimant $500,000 in compensatory damages. The panel recommends expungement of the Termination Comment from Claimants Form U-5 based on the defamatory nature of the information. |
| 20 | Oppenheimer & Co. Inc. vs. Mark Adams, FINRA Case No. 08-02559 | April 8, 2010 | Firm asserted a claim for breach of promissory note. Respondent counterclaimed for wrongful termination and loss of business. | Firm is liable for and shall pay to Respondent compensatory damages in the amount of $242,741. |
| 21 | Timothy Leahy v. Charles Schwab & Co., Inc., FINRA Case No. 09-00260 | February 26, 2010 | Claimant asserted the causes of action for wrongful and pretextual termination and defamatory reporting of his termination on his U5 termination notice. | Respondent is liable for defamation and lost wages and shall pay to Claimant compensatory damages in the sum of $279,184 plus interest at the rate of 9% per annum accruing from September 18, 2008, until the date of payment of the Award. Respondent is liable and shall pay to Claimant punitive damages in the sum of $1,500,000 pursuant to Florida Statutes Section 768.73(1)(c). Expungement is also awarded based on the defamatory nature of the information. |
| 22 | Joseph Jeffrey Mattia vs. Merrill Lynch Pierce Fenner & Smith, Inc., FINRA Case No. 09-00618 | November 4, 2009 | Claimant asserted causes of action for breach of contract, compensation, libel or slander on the Form U5, and wrongful termination. | Respondent is liable for and shall pay to Claimant compensatory damages in the amount of $560,000. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 23 | Ronald E. Morrone vs. Independent Financial Marketing Group, Sun Life Financial Distributors, Inc. and LPL Holdings, Inc., FINRA Case No. 08-03509 | July 27, 2009 | Claimant asserted causes of action for wrongful termination, breach of written contract, and improper marking of Claimant's Form U5. Claimant requested compensatory damages of $75,000. | Respondent LPL is liable and shall pay to Claimant compensatory damages in the amount of $45,000.  The panel recommends expungement of all references to the above captioned arbitration from Claimant Ronald E. Morrone's registration. |
| 24 | Carlos Reisen, Jr. vs. J.J.B. Hillard, W.L. Lyons, LLC, FINRA Case No. 08-02881 | June 30, 2009 | Claimant asserted causes of action for libel, slander, and negligence.  Claimant claimed that Respondent made statements that harmed Claimant's reputation on his Form U5.  The panel found "untruthful U5 had the immediate effect of making Morrone unemployable in the financial industry." | Respondent, J.J.B. Hillard, W.L. Lyons, LLC, is liable for and shall pay to Claimant, Carlos Reisen, Jr., the sum of $516,000 in compensatory damages, $5,400 in expert fees, and $115,000 in attorneys fees.  The panel also recommends the expungement of the Termination Comment from Claimants Form U5. |
| 25 | Michael F. Maloney vs. Banc of America Securities LLC, FINRA Case No. 08-00441 | June 17, 2009 | Claimant asserted claims for wrongful termination, and tortuous interference with prospective economic advantage. | Respondent is liable for and shall pay to Claimant compensatory damages in the amount of $227,940 plus interest at the rate of 9% per annum accruing from February 28, 2005 until the award is paid in full. |
| 26 | Edward J. Schiavi v. Merrill Lynch, Pierce Fenner & Smith Incorporated., FINRA Case No. 08-02116 | April 23, 2009 | Claimant asserted a claim for breach of contract, defamation, and others. | Claimant's claim for defamation is granted.  Respondent is liable and shall pay to Claimant compensatory damages in the sum of $200,000.  The panel also recommended expungement. |
| 27 | Beck v. SunTrust Robinson Humphrey, FINRA Case No. 08-02482 | December 29, 2008 | Claimant asserted a claim for breach of contract, false and misleading reporting on the form U-5, and wrongful termination, all relating to the termination of claimant's employment with Respondent because of a customer's claimant regarding the lack of liquidity of Auction Rate Securities purchased by the customer.  SunTrust claimed Beck was an at-will employee and could be fired for any non-discriminatory reason. | Respondent is liable and shall pay to Claimant compensatory damages of $1,192,526, punitive damages of $2,500,000, attorney's fees of $419,057, and costs of $50,370. |
| 28 | Crandall v. Citigroup Global Markets, Inc., FINRA Case No. 07-01526 | April 24, 2008 | Claimant asserted a claim for breach of contract, false and misleading reporting on the form U-5, and wrongful termination, all relating to the termination of claimant's employment with Respondent. | Respondent is liable and shall pay to Claimant compensatory damages of $240,000. |

| No. | Case Name and No. | Date | Description | Holding |
|-----|-------------------|------|-------------|---------|
| 29 | Ferland v. A.G. Edwards & Sons, Inc., FINRA Case No. 07-01821 | April 16, 2008 | Clamant asserted a claim for wrongful termination, failure to pay commissions, and defamation. The causes of action related to Claimant's allegation that she was terminated for allegedly violating firm and industry rules even though her actions were approved by Respondent's compliance staff. | Arbitrators award $7,000 in compensatory damages and recommended the expungement of the termination comment contained in the U-5 "based on the defamatory nature of the information." |
| 30 | Rosensweig v. Morgan Stanley & Co., Inc. , 494 F.3d 1328 (11th Cir. 2007) | August 9, 2007 | Morgan Stanley appealed the decision of the arbitrators to award $1,649,000 to Rosensweig. | The United States Court of Appeals for the 11th Circuit affirmed the award of $1,649,000 in favor of Rosensweig for wrongful termination. |
| 31 | Zojaji v. Merrill Lynch, NASD Case No. 06-02598 | July 20, 2007 | Zojaji asserted claims for wrongful termination and defamation relative to the language on his U-5. Merrill asserted that Zojaji was an "at-will" employee and that cause for termination existed. | Arbitrators rejected the at-will theory and awarded Zojaji $400,000 in compensatory damages and $1,200,000 in punitive damages. |
| 32 | Behnen v. A.G. Edwards & Sons, Inc. and Steven Holloway Garrett, NASD Case No. 06-01380 | May 2, 2007 | Claimant asserted a claim for defamation and libel or slander on his Form U-4. Claimant alleged that Respondent AGE provided false and defamatory statements concerning the reasons for termination language contained in his Form U-5. | Respondent is found liable for $248,353 and the panel ordered expungement of the termination comment "because the comment is defamatory." |
| 33 | Wachovia Securities v. Wiegand, Case No. 07CV243 IEG (S.D.Cal. 2007) | April 16, 2007 | Wachovia sought to set aside the arbitration award in favor of Wiegand and asserted that the "at-will" defense required that the award be vacated. | Wachovia argued that the arbitrators, in failing to dismiss the case, manifestly disregarded the employment at will law.  However, counsel for Wiegand in his final argument presented the panel with a copy of Agron v. PaineWebber, which holds that "an employee's agreement to arbitrate all disputes ... implies a for-cause termination requirement."  The court held that the panel did not disregard the law, but rather "chose to apply an exception to that rule." |
| 34 | Bishop v. McDonald Investments, Inc. and Robert G. Jones, NASD Case No. 04-00256 | February 14, 2007 | Claimant asserted a claim for defamation, wrongful termination and misrepresentation arising from his employment with McDonald Investments. Claimant alleged that McDonald delayed in the filing of his U-5 form and that McDonald submitted false and misleading statements on his U-5 form. | The arbitrators awarded Bishop $246,000 in compensatory damages, $611,678 in punitive damages, and recommended expungement of the U-5 language, "based on the defamatory nature of the information." |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 35 | Maxwell v. McDonal Investments, Inc., NASD Case No. 04-04795 | February 14, 2007 | Claimant asserted a claim for defamation, wrongful termination and misrepresentation arising from his employment with McDonald Investments. Claimant alleged that McDonald delayed in the filing of his U-5 form and that McDonald submitted false and misleading statements on his U-5 form. | The arbitrators awarded Maxwell $381,700 in compensatory damages, $420,019 in punitive damages, and recommended expungement of the U-5 language, "based on the defamatory nature of the information." |
| 36 | Weigand v. Wachovia Securities, LLC NASD Case No. 06-00462 | January 4, 2007 | Weigand alleged breach of express contract, termination without good cause, wrongful termination I violation of public policy and negligence. Wachovia asserted that Weigand was terminable "at-will" and that cause existed. | Wachovia liable to Weigand for $1,500,000.00. |
| 37 | Garcia v. Citigroup Global Markets, NASD Case No. 05-03017 | December 6, 2006 | Garcia asserted that he was wrongfully terminated and asserted claims for breach of the express and implied terms of an employment agreement, breach of customs and practices of the industry; breach of equitable principles of trade; unfair competition; and tortuous interference. Smith Barney asserted that Garcia was an "at-will" employee and cause existed to terminate him. | Smith Barney liable to Garcia for $1,820,000 in compensatory damages and $1,750,000 in punitive damages. |
| 38 | Hazlett v. Wachovia Securities, LLC., et.al., NASD Case No. 04-08628 | May 1, 2006 | Hazlett asserted causes of action related to unpaid commissions and termination of employment. Hazlett asserted breach of MasterShare agreement, duty of good faith and fair dealing, oral employment contract and others. Wachovia denied all allegations and asserted various defenses, including that Hazlett was an "at-will" employee. | Wachovia is liable to Hazlett for $253,045.22 plus interest (compensatory damages) for breach of MasterShare agreement. |
| 39 | Newton v. Prudential Securities, Inc., NASD Case No. 03-08457 | May 1, 2006 | Newton asserted breach of MasterShare agreement and employment agreement, promissory estoppel, breach of equitable and just principles of fair trade and others. Newton's cause of actions arises from the termination of Newton's employment with Prudential. Prudential denied all claims and asserted various defenses, including that Newton was an "at-will" employee. | Prudential is liable to Newton for $125,000 (compensatory damages) including interest for breach of equitable principles and promissory estoppel. Prudential must also change language on U-5. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 40 | Wells Van Pelt, Jr. v. UBS Financial Services, Inc., Williams,  NASD Case No. 04-00619 | November 4, 2005 | Van Pelt asserted wrongful termination, defamation, conversion, breach of duty of good faith and fair dealing and others arising from termination of employment with UBS.  UBS denied all claims and asserted various defenses including no wrongful termination because Van Pelt was an "at-will" employee.  Claims against Williams were dismissed. | UBS liable to Van Pelt for $2,471,330 (compensatory damages), $16,579 (expert witness fees) and UBS must change U-5 form language and file amendment within 30 days. |
| 41 | Mitchell, Jr. v. Charles Schwab & Co., Inc., NASD Case No. 04-04703 | October 27, 2005 | Mitchell asserts breach of contract and promissory estoppel arising from termination of employment contract without just cause. Schwab denied claims and asserted various defenses including Mitchell was "at-will" employee who could be terminated for any reason. | Schwab is liable to Mitchell for $350,000 (compensatory damages), and  $500 (reimbursement of filing fee) |
| 42 | Mehall v. Wachovia Securities, LLC., NASD Case No. 03-00345 | September 1, 2005 | Mehall asserted breach of contract, wrongful termination and intentional interference with economic expectancies.  Wachovia denied all claims.  Panel found the employee handbook to have set out that Mehall was an employee "at-will" and procedures for dismissal for cause.  The two propositions raised two distinct expectations creating ambiguity which must be construed in favor of Mehall. | Wachovia is liable to Mehall for $901,031 (general damages), $250,000 (punitive damages), $133,881 (attorney's fees for violation of public policy) and $6,757.85 (costs). |
| 43 | Morgenstern v. American Express Financial Advisors, Inc., Johns, NASD Case No. 01-02953 | December 21, 2004 | Morgenstern various claims including breach of contract, negligent misrepresentation, breach of implied in fact contract of employment and others.  American Express denied all claims and asserted various defenses including Morgenstern was an "at-will" employee.  All claims against Johns were dismissed. | American Express liable to Morgenstern for $700,000. |
| 44 | Reager v. Wachovia Securities, NASD Case No. 02-03721 | October 8, 2004 | Reager asserted that he was wrongfully terminated by Wachovia Securities.  Wachovia denied the claim and asserted various affirmative defenses, including presumably the "at-will" defense. | Reager was awarded $3,000 in compensatory damages, $100,000 in emotional distress damages, and $400,000 in punitive damages. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 45 | Morgan Stanley & Co. v. Melhem, Case No. 04-60105-CIV-COHN (S.D.Fla. 2004). | June 4, 2004 | Morgan Stanley filed a petition to vacate the award of the arbitrators on the grounds that, by awarding Melhem damages for wrongful termination, the arbitrators ignored the "at-will" doctrine and the contract that Melhem had signed which stated that his employment was at-will. | The Court rejected Morgan Stanley's argument and confirmed the award. |
| 46 | Morgan Stanley & Co., Inc., v. Oscar Melhem Marcote, NASD Case No. 02-04012 | January 8, 2004 | Morgan Stanley fired Melhem and asserted breach of contract as to the promissory note and memo agreement.  Melhem counterclaimed for fraudulent inducement, wrongful termination, and defamation.  Morgan Stanley asserted Melhem was an "at-will" employee. | Morgan Stanley liable to Melhem (counterclaim) for $1,750,000 as compensatory damages for termination w/out cause and defamation.  Morgan Stanley liable to Melhem for $155,730 as compensatory damages for wrongful termination and breach of promised loans.  Morgan Stanley shall forgive up-front loan made to Melhem ($385,500).  Morgan Stanley is liable to Melhem for interest on compensatory damages. |
| 47 | Hurley v. TCAdvisors Network, Inc., Finn and Dominick, NASD Case No. 02-03783 | January 7, 2004 | Hurley asserts breach of contract, negligent misrepresentation and others arising from Hurley's allegation that he was forced to resign and that TC Advisors filed a false U-5 upon departure.  Also Hurley asserts that TC Advisors breached their contractual obligations and denied employment benefits. TC Advisors denied all claims and asserted various defenses including Hurley was an "at-will" employee. | TC Advisors are liable to Hurley for $75,000 plus 8% interest (compensatory damages), $75,000 (punitive damages) for bartering the form U-5 in settlement negotiations and filing false/defamatory statements on U-5.  TC Advisors must change language on U-5 form. |
| 48 | Rosensweig v. Morgan Stanley Dean Witter, Inc., NASD Case No. 01-05703 | December 9, 2003 | Rosensweig asserted breach of employment agreement, breach of equitable and just principles of trade and various others.  Causes of action relate to Rosensweig's former employment with Morgan Stanley.  Morhan Stanley denied all claims and asserted various defenses including Rosensweig could not recover on any theory of wrongful termination. | Morgan Stanley liable to Rosensweig for $1,649,860 for breach of employment agreement, tortuous interference and conversion.  No pre-judgment interest.  Panel also ordered Morgan Stanley to change in language used on U-5. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 49 | Brennan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., NASD Case No. 01-06102 | September 2, 2003 | Brennan asserted various claims arising out of wrongful termination and defamatory statements published on forms U-4 and U-5.  Brennan asserted wrongful termination, breach of good faith and fair dealing, negligence and others.  Merrill denied all claims and asserted various defenses including statute of limitations, Brennan was "at-will" employee who could be terminated any time without cause and others. | Merrill liable to Brennan for $312,000 (compensatory damages) and Merrill must change the language of the form U-5 to state voluntary departure. |
| 50 | Whisler v. PaineWebber, Inc., NASD Case No. 01-04670 | April 28, 2003 | Whisler asserted breach of contract duties, bad faith wrongful discharge, unjust enrichment and others. Whisler's cause of actions arises from employment with Paine Webber.  Paine Webber denied all claims and asserted various defenses including Whisler was an "at-will" employee and was discharged for cause, failure to mitigate damages, contributory negligence and others. | Paine Webber liable to Whisler for $50,000 (compensatory damages). |
| 51 | Holzberg v. First Union Securities, Inc., Cameron and Thompson, NASD Case No. 00-05477 | February 25, 2003 | Holzberg asserted breach of employment agreements, covenant of good faith and fair dealing, wrongful termination in violation of public policy and others.  First Union denied all claims and asserted that this was a case about an underachieving "at-will" employee who blatantly disregarded a First Union policy and who was terminated for making misstatements about First Union and Cameron to the press. | First Union liable to Holzberg for $100,000 and $250 (filing fee).  Claims against Cameron and Thompson were dismissed. |
| 52 | Pasquesi and Knutson v. Burlington Capital Markets, Inc., NASD Case No. 01-01831 | January 16, 2003 | Pasquesi asserted breach of contract, improper termination and unpaid salary and commissions. Burlington denied all claims and asserted various defenses including contracts were terminable "at-will", good cause to terminate, Pasquesi's violated company policy and damages mitigated because found other employment. | Burlington liable to Pasquesi for $457,500 (compensatory damages) and to Pasquesi for $183,750 (additional compensatory damages). |

| No. | Case Name and No. | Date | Description | Holding |
|-----|-------------------|------|-------------|---------|
| 53 | Jack Gilbert and Brenda Gilbert v. A.G. Edwards & Sons, Inc., et.al., NASD Case No. 99-05350 | September 21, 2002 | Gilbert asserted wrongful termination, libel, slander, sexual harassment, wrongful denial of just compensation and others. AG Edwards denied all claims and asserted various defenses including no sexual harassment, Gilbert was "at-will" employee who had been advised of his employment, statute of limitations and others. AG Edwards countered Gilbert's claims with breach of employment agreement and others.  Gilbert denied all counterclaims. | AG Edwards is liable to Gilbert $100,000 (compensatory damages). |
| 54 | Coe v. Tucker Anthony Inc., et.al., NASD Case No. 01-03152 | September 19, 2002 | Loe asserted wrongful termination, defamation, injurious falsehood and others.  Tucker denied all claims and asserted various defenses including failure to state a claim which relief can be granted, Loe was an "at-will" employee and others. | Tucker liable to Coe for $170,000 plus 4% interest (compensatory damages) and $300 (filing fee paid by C). |
| 55 | Trammell v. Morgan Stanley Dean Witter, Inc., Bower, NASD Case No. 00-04100 | September 9, 2002 | Trammell asserted various claims including wrongful termination, breach of contract, breach of covenant to deal with Trammell fairly and good faith. Morgan Stanley denied all claims and asserted various defenses including Trammell was "at-will" employee, termination of Trammell's employment was lawful and Trammell's damages were caused or contributed by Trammell's own wrongful conduct. | Morgan Stanley is liable to Trammell for $78,030 plus interest (actual damages), $78,900 plus interest (actual damages) and $52,404 plus interest (actual damages) and $375 filing fee. Morgan Stanley (MS) liable to Trammell for 908 shares of stock (June 30, 2003) and 187 shares of stock (June 30, 2004). |
| 56 | Jacobs v. Financial Network Investments Co., et.al., NASD Case No. 01-03428 | June 19, 2002 | Jacobs asserted claims arising out of wrongful termination with out cause and misrepresentations made on form U-5.  Jacobs asserted breach of contract, fraud, wrongful termination and others.  FNIC denied all claims and asserted various defenses including failure to state a claim, Jacobs was an independent contractor and others. | FNIC liable to Jacobs for $375,000, $125,000 (punitive damages) and FNIC must change CRD to reflect voluntary resignation. |
| 57 | Cular and Pappas v. Metropolitan Life Ins. Co., NASD Case No. 99-05034 | February 20, 2002 | Pappas asserted wrongful termination, breach of contract, fraud and others.  MetLife denied all claims and asserted various defenses including statute of limitations, statute of frauds, Pappas's are "at-will" employees, failure to mitigate damages and many others. | MetLife liable to Pappas for $50,000 (compensatory damages). |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 58 | Turbeville v. Prudential Securities, Inc., NASD Case No. 00-02526 | December 19, 2001 | Turbeville asserted various claims arising out of employment with Prudential. Turbeville asserted breach of contract, promissory estoppel, defamation and others. Prudential denied all claims and asserted various defenses including failure to state a claim which relief may be granted, statute of frauds, Turbeville was "at-will" employee who could be terminated at any time with out cause and others. | Prudential liable to Turbeville for $325,251 plus 6% interest (compensatory damages) and $600 (filing fee). |
| 59 | DeLuca v. Bear Stearns & Co., Inc., 175 F. Supp.2d 102 (D.Mass. 2001). | November 16, 2001 | DeLuca, a female financial consultant, asserted claims of sexual harassment, gender discrimination, and retaliation. Bear Stearns claims that she was an employee at-will and she acknowledged that she was an employee at-will by signing an arbitration agreement which stated her employment could be terminated at anytime. | An arbitrator might conclude that Bear Stearns U-4 arbitration agreement, its Culture Book and practices, together with statements from management created an implied employment contract in which it *could not* terminate DeLuca except for good cause at the time she was required to sign the new handbook. |
| 60 | Anderson v. Morgan Stanley Dean Witter, Inc., NASD Case No. 00-01954 | September 21, 2001 | Anderson asserted claims including breach of contract, promissory estoppel, breach of covenant of good faith and fair dealing and punitive damages. Morgan Stanley denied all claims and asserted various defenses including Anderson was an employee "at-will" who could be terminated at any time for any reason or no reason at all. Morgan Stanley claimed Anderson was removed from the position because Anderson's performance was unacceptable. | Morgan Stanley liable to Anderson for $700,000 (compensatory damages). |
| 61 | Granata v. The Prudential Ins. Co. of America, Pruco Securities Corp., Gebbia, NASD Case No. 99-02446 | July 31, 2001 | Granata asserted wrongful termination and defamation. Prudential denied all claims and asserted various defenses including Granata was an "at-will" employee, failure to state a claim which relief may be granted and suffered no damages. | Prudential and Pruco are liable to Granata for $28,000 (compensatory damages). |
| 62 | Frazier v. Olde Discount Corp., NASD Case No. 00-01541 | June 11, 2001 | Frazier asserted a claim of wrongful termination. Olde denied allegation and asserted various defenses including failure to state a claim which relief can be granted, statute of limitations, "at-will" employee and others. | Olde liable to Fraizer for $12,500 (compensatory damages) and Olde shall make changes to Fraizer's form U-5. |

| No. | Case Name and No. | Date | Description | Holding |
|-----|-------------------|------|-------------|---------|
| 63 | Murphy v. Salomon Smith Barney, Inc., NASD Case No. 99-05473 | April 30, 2001 | Murphy asserted breach of implied contract, earned and unpaid bonus compensation, quantum meruit and others.  Smith Barney denied all claims and asserted various defenses including no breach because Murphy was an "at-will" employee, damages suffered were caused by Murphy, failure to mitigate and others. | Smith Barney liable to Murphy for $150,000 (compensatory damages). |
| 64 | Ward III v. Citicorp Securities, Inc., NASD Case No. 99-05705 | April 5, 2001 | Ward asserted breach of contract, unpaid bonus compensation, quantum meruit and others. Citigroup denied all claims and asserted various defenses including Ward not employed by Citigroup, Ward was an "at-will" employee who could be terminated with out cause and others. | Smith Barney liable to Ward for $250,000 plus 6% interest (compensatory damages) and $375 (filing fee). |
| 65 | Wick v. Piper Jaffray, Inc., NASD Case No. 99-01990 | November 30, 2000 | Wick asserted breach of employment contract, defamation, intentional interference with economic relationships and others. Piper denied all claims and asserted various defenses including statute of limitations, Wick was "at-will" employee who could quit at any time, failure to mitigate damages and others. | Piper liable to Wick for $1,400,000 (compensatory damages), $850,000 (punitive damages), $300,742.25 (attorneys fees and costs).  Interest on damages will be added at prime lending rate. |
| 66 | Coleman v. Metropolitan Life Ins. Co., et.al., NASD Case No. 99-02849 | October 20, 2000 | Coleman asserted breach of contract, promissory estoppel, wrongful discharge in violation of public policy and others.  MetLife denied all claims and asserted various defenses including statute of limitations, damages caused by negligence of Coleman, Coleman was "at-will" employee and others. | MetLife liable to Coleman for $22,425 plus 9% interest (compensatory damages). |
| 67 | Sadosky v. Brean Murray & Co., Inc., NASD Case No. 99-03549 | July 10, 2000 | Sadosky asserted breach of employment contract, quantum meruit, and unjust enrichment and restitution.  Brean denied all claims and asserted various defenses including Sadosky "at-will" employee and can be terminated at any time, failure to state a claim upon which relief may be granted, and others. | Brean liable to Sadosky for $30,000 plus 9% interest, $15,000 (attorneys fees), warrants to purchase 14,000 shares of Somenetic and 8,000 shares of Zydeco Energy. |
| 68 | Sine v. TD Securities, Inc., NASD Case No. 98-04235 | June 29, 2000 | Sine asserted breach of contract, promissory estoppel, fraudulent inducement and others.  TD Securities denied all claims and asserted Sine was an "at-will" employee, Sine was terminated for cause and others. | TD Securities liable to Sine for $750,000 plus interest (breach of contract claim). R shall change language on form U-5 to state "an inappropriate interpersonal dealing unrelated to compliance." |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 69 | D'Amato v. Dean Witter Reynolds, Inc., NASD Case No. 98-03598 | June 20, 2000 | D'Amato asserted that he was wrongfully terminated and his termination was based on both his religion and age.  Dean Witter denied all claims and asserted various defenses including Anderson can not recover on any claim based upon his termination because he was an "at-will" employee. | Dean Witter liable to D'Amato for $116,000 (compensatory damages) and $500 (filing fees). |
| 70 | Katz v. Deutsche Bank Securities, Inc., Ingram, NASD Case No. 98-04995 | June 15, 2000 | Kate asserted breach of contractual obligation to pay 1998 bonus pursuant to agreement, failure to follow practice or fulfill contractual obligations by failing to pay bonus earned and age/religion were motivating factors when Deutsche terminated his employment. Deutsche denied all claims and asserted various defenses including Kate was an "at-will" employee, failed to prove existence of 1998 agreement, Kate already received money and others. | Deutsche liable to Katz for $72,500 plus 9% interest (compensatory damages). |
| 71 | Paul v. Prudential Securities, Inc., NASD Case No. 99-00125 | June 12, 2000 | Paul asserted breach of employment agreement, Prudential retaliated by filing an amended U-4 relating to a previously settled matter and Prudential attempted to cover up its retaliation. Prudential denied all claims and asserted various defenses including Paul was an "at-will" employee, statute of limitations, and others. | Prudential liable to Paul for $210,000, $19,745.50 (attorneys fees). |
| 72 | Bausk v. First Union Capital Markets Corp., NASD Case No. 99-05492 | June 2, 2000 | Bausk asserted wrongful termination, defamation and others.  First Union denied all claims and asserted that Bavsk was an "at-will" employee, there was no employment agreement and Bausk was terminated for cause. Bausk was upset over a phone call made in the early morning after wife had surgery.  Bausk left an emotional message to supervisor who requested that Bausk meet with him about it.  Bausk never met with supervisor who then submitted phone message to Group Head.  Bausk was terminated for "insubordination." | First Union liable to Bausk for $31,250 without interest for unpaid 1999 guaranteed salary, $250,000 for 1999 guaranteed incentive award, $175,000 without interest for breach of contract, $500 without interest for unreimbursed expenses, $2,000 without interest for job search expenses, $3,200 w/out interest for COBRA coverage for 8 months, $35,000 w/out interest for attorney's fees, $500 for filing fee, and $2,500 for interim injunctive relief surcharge. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 73 | Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wyatt, Case No. 8:98-CV-55-T (M.D.Fla. 2000). | March 24, 2000 | Wyatt, a financial consultant, developed a rare disease affecting her ability to speak.  She applied for and received disability which was discontinued at a later date.  Wyatt filed an action for wrongful termination, breach of fiduciary duty and others arising from her employment with Merrill Lynch.  Merrill sought to enjoin the case. | Wyatt asserts that her wrongful termination claim related to cases holding that an employee subject to an arbitration agreement can only be discharged for cause. The Court denies the request for permanent injunction to the extent that Plaintiff's wrongful termination claim is based on the holding that an employee subject to an arbitration agreement may only be discharged for cause. |
| 74 | Marasco v. The Prudential Ins. Co. of America, NASD Case No. 98-02781 | March 4, 2000 | Marasco asserted that he was an employee of Prudential and not an independent contractor.  Marasco asserted breach of contract from an implied covenant promising to only terminate Marasco for good cause.  Prudential asserted that even if Marasco was an employee of Prudential, Marasco would be an "at-will" employee and if found there to be an implied covenant, the termination was for good cause. | Marasco was found to be an employee of Prudential. Marasco was found to have an implied covenant and could only be discharged for good cause.  Discharge was found not to be for good cause or in good faith. Prudential liable to Marsco for $925,000 (breach of contract damages).  Includes interest, pre/post award economic losses, lost of past/future earnings and for losses of fringe benefits and potential pension rights. |
| 75 | Avena, et.al. v. Shelby Cullom Davis & Co., L.P., NASD Case No. 98-01571 | December 30, 1999 | Claimants asserted breach of employment contract, fraudulent misrepresentation, unfair competition, and others.  Shelby denied claims and asserted failure to state a claim upon which relief may be granted and Claimants were "at-will" employees. | Shelby liable to Bove for $21,250.  Shelby liable to Pezzello for $50,000.  Shelby liable to Stegmann for $27,500.  Shelby liable to Wright for $7,600. |
| 76 | Parsons and Petri v. The Prudential Ins. Co. of America, NASD Case No. 98-01744 | July 8, 1999 | Parsons asserted wrongful termination and defamation.  Prudential denied claims and asserted Parsons and Petri are former "at-will" employees who were terminated after an internal investigation concluded that they had altered a company document to conceal that they had not followed certain corporate directives and then attempted to cover up their wrongdoing.  Prudential also asserted various defenses. | Prudential liable to Parsons for $250,000, and $500,000 (punitive damages).  Prudential liable to Petri for $250,000, and $500,000 (punitive damages).  Prudential liable to Parsons for $500 (filing fee).  Prudential shall file revised forms U-5 reflecting that Parsons were voluntarily terminated. |
| 77 | Brown v. Comerica Securities, Inc., Barlett and Davis, NASD Case No. 98-02677 | June 29, 1999 | Brown asserted wrongful termination, termination in violation of public policy, breach of covenant of good faith and fair dealing and others. Comerica denied claims and asserted Brown was "at-will" employee, terminated for good cause, Brown paid all commissions, and other defenses. | Comerica liable to Brown for $46,297 (unpaid wages), $5,788 (interest), $3,000 (waiting time), $13,844 (attorneys fees), $300,000 (wrongful termination), $23,000 (value of stock shares), $12,000 (expert witness fee), and Comerica shall file new form U-5 which states, "left to pursue other business opportunities." |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 78 | Orr v. Merrill Lynch, Pierce, Fenner & Smith, Inc., Ellis, NASD Case No. 96-02973 | May 29, 1999 | Orr asserted emotional distress, breach of contract, wrongful termination, filing of false form U-5, defamation and others.  Merrill denied claims and asserted Orr was "at-will" employee and may be discharged at any time. Merrill also asserted Merrill followed proper procedure in terminating employment, and denied any false statements in the U-5. | Merrill Lynch liable to Orr for $42,250 (compensatory damages) and Merrill shall change language in form U-5. |
| 79 | Mohr v. Hambrecht Quist LLC., NASD Case No. 98-00560 | May 20, 1999 | Mohr asserted wrongful termination, breach of contract, defamation and others.  Hambrecht denied all claims and asserted that Mohr was an exempt employee and was a terminable "at-will" employee. | Hambrecht liable to Mohr for $110,000 (compensatory damages), $40,000 (attorneys fees and costs). |
| 80 | Newman v. Dean Witter Reynolds, Inc., NASD Case No. 96-03187 | January 25, 1999 | Newman asserted that Dean Witter acted wrongfully in recruiting him to work in Fla. Dean Witter made certain promises to him which they never kept.  Newman asserted that he was released due to duress (compromise where Newman was only given 3 hrs to accept or resign) and other title VII claims.  Dean Witter denied all allegations and asserted various defenses including Newman was an employee "at-will" who could be terminated at any time and whose complaints about the working conditions did not state a legal claim. | Dean Witter liable to Newman for $227,000 (including interest), $200,000 (punitive damages) for title VII claim, $50,000 for attorney's fees and $5,500 for reimbursement of hearing session deposits made by Newman. |
| 81 | Ross v. A.G. Edwards Sons, Inc., Merrill Lynch Co., NASD Case No. 96-01196 | December 2, 1998 | Ross asserted defamation by A.G. Edwards for misrepresentation of his U-5 which cast him in a false light and caused Merrill to not fulfill its contract with .  Ross also asserted breach of contract against Merrill.  A.G. Edwards denied claims and asserted various defenses including Ross was an "at-will" employee, Ross was never employed by Merrill, statements disclosed were truthful and others. | A.G. Edwards liable to Ross for $840,000 (compensatory damages).  Merrill liable to Ross for $77,831 (compensatory damages).  A.G. Edwards Sons Inc. are liable to Ross for $4,950 (forum fees). |

| No. | Case Name and No. | Date | Description | Holding |
|-----|-------------------|------|-------------|---------|
| 82 | Sweeny v. Prime Charter, Ltd., NASD Case No. 97-05610 | October 6, 1998 | Sweeny asserted breach of contract, fraudulent hiring, and unlawful discrimination arising from misrepresentations made by Prime to Sweeny concerning the terms of the offered employment contract.  Prime denied all claims and asserted Sweeny was hired as an "at-will" employee and Sweeny signed documents agreeing to the status, Sweeny never had series 24 license and had cause to terminate due to decreased productivity. | Prime liable to Sweeny for $50,869.70 plus 9% interest (actual damages). |
| 83 | Dougherty, Jr., Garrow, Martin v. First Union Capital Markets Corp., First Union Corp., NASD Case No. 97-03376 | September 30, 1998 | Claimants asserted false representations, willfully and purposefully misrepresented material facts and breach of employment contracts.  First Union denied claims and asserted failure to state a cause of action, terminable "at-will" contracts, lack of employment contract and failure to adequately perform. | First Union liable to Dougherty for $58,000.  First Union liable to Garrow for $279,197.  First Union liable to Martin for $199,150.  First Union liable to all Claimants attorneys fees in the amount of $103,269. |
| 84 | Morgan Stanley Co., Inc. v. Yamane, NASD Case No. 96-04013 | September 8, 1998 | Morgan Stanley asserts that Yamane breached his contractual and fiduciary duties to Morgan Stanley by resigning and opening a new competing business and attempting to recruit Morgan Stanley's employees.  Yamane denied claims and asserted Morgan Stanley fabricated that he had been "terminated with cause" which caused Morgan Stanley to withhold money in earned compensation.  Yamane asserted breach of contract, fiduciary duties and others. | Morgan Stanley is liable to Yarmane for compensation benefits owed, 69,775 shares of MSDW stock and 29,363 MSDW stock options as of May 18, 1998. Morgan Stanley shall include dividends and accruals from the date of forfeiture. Morgan Stanley must also correct Yarmane's U-5 reflecting that Yarmane voluntarily resigned. |
| 85 | Doub v. Citizens Bank Trust Co., J.C. Bradford, NASD Case No. 97-04412 | July 20, 1998 | Doub asserted breach of agreement between parties, breach of implied duty of good faith and fair dealing and others arising from false promises made in order to induce Doub to join firm.  Bradford denied all claims and asserted failure to state a claim upon which relief may be granted, Doub contacted Bradford about working for Bradford, and others.  Both parties stipulated that Doub was an "at-will" employee. | Bradford liable to Doub for $82,400 (compensatory damages) |

| No. | Case Name and No. | Date | Description | Holding |
|-----|-------------------|------|-------------|---------|
| 86 | Roth v. Sunpoint Securities, Inc., Griffith, NASD Case No. 96-05233 | May 22, 1998 | Roth asserted breach of employment contract, promissory estoppel, violations of NASD rules and regulations and others.  Sunpoint denied all claims and asserted Roth was merely hired as a registered representative terminable "at-will" upon 30 days notice and others. | Sunpoint liable to Roth for $14,000 (actual damages), $13,000 (attorneys fees). |
| 87 | Jones v. Salomon Smith Barney, Inc., NASD Case No. 95-04058 | May 12, 1998 | Jones asserted breach of contract, breach of implied covenant of good faith and fair dealing, material misrepresentations and others. smith Barney denied all claims and asserted various defenses including termination was for cause, Jones was "at-will" employee who could be terminated at any time. | Smith Barney liable to Jones for $25,000 without interest, and $5,000 (sanction). |
| 88 | Hibbing v. IDS Life Ins. Co., American Express Financial Advisors, Inc., Klosterman, NASD Case No. 97-01155 | January 8, 1998 | Hibbing asserted wrongful termination and defamation.  IDS denied claims and asserted various defenses including Hibbing was "at-will" employee and termination upon notice was valid exercise of their rights in accord with the written agreement, and others. | IDS and American Express liable to Hibbling for $35,750, and $64,250. |
| 89 | Tierney v. Interacciones Global, Inc., NASD Case No. 96-04606 | December 4, 1997 | Tierney asserted breach of contract, wrongful termination and others.  IGI denied claims and asserted Tierney was "at-will" employee, employment contract never included guaranteed bonuses, and other defenses. | IGI liable to Tierney for $43,692. |
| 90 | Kuehner-Hebert v. Dickinson & Co., NASD Case No. 94-04826 | November 3, 1997 | Claimant asserted defamation and wrongful discharge.  Dickinson denied claims and asserted Claimant was "at-will" employee who was terminated for poor sales performance, failure to mitigate damages and other defenses. | Dickinson shall change language in form U-5 to reflect truth.  Claimant was found not to be a poor performer.  Dickinson liable to Claimant for $60,000. |
| 91 | Hammond v. Kirkpatrick, Pettis, Smith, Polian, Inc., NASD Case No. 96-04794 | August 28, 1997 | Hammond asserted breach of contract and promissory estoppel.  Kirkpatrick denied claims and asserted no employment contract existed and Hammond was "at-will" employee. | Kirkpatrick liable to Hammond for $255,000 (compensatory damages). |
| 92 | Gronsman v. Centennial Securities Co., Inc., Alsover, Jr., NASD Case No. 96-02689 | August 6, 1997 | Gronsman asserted wrongful termination, age discrimination, breach of contract and others.  Centennial denied claims and asserted Gronsman was "at-will" employee, and Gronsmans performance was declining. | Centennial liable to Gronsman for $100,000, $6,000 (forum fees), $1,000 (reimbursement of fees). |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 93 | Schenk v. PaineWebber, Inc., NASD Case No. 95-05153 | July 18, 1997 | Schenk asserted breach of contract, age discrimination and wrongful termination. Paine Webber denied claims and asserted replacement was larger producer than Schenk, that Schenk was an "at-will" employee, that Schenk failed to state a claim upon which relief may be granted and other defenses. | Paine Webber liable to Schenk for $260,373 (compensatory damages). |
| 94 | Edeline v. Merrill Lynch, Pierce, Fenner & Smith, Inc., and Gebhardt and Vengelen v. Merrill Lynch, Pierce, Fenner & Smith, Inc., NASD Case No. 95-04966 consolidated with No. 95-00771 | June 20, 1997 | Claimants asserted wrongful discharge, discharge in violation of employment contract, unjust enrichment and others.  Merrill Lynch denied claims and asserted comparative fault, failure to mitigate and various other defenses, including the "at-will" doctrine. | Merrill Lynch liable to Edeline for $496,000 (lost income) and $250,000 (punitive damages-wrongful discharge).  Merrill Lynch is liable to Gebhardt for $553,000 (lost income) and $700,000 (punitive damages wrongful discharge) |
| 95 | Prince, Jr. v. Prudential Securities, Inc., Provence and Rowe, NASD Case No. 96-03961 | May 30, 1997 | Prince asserted defamation of character, breach and torturously interfered with contract, discrimination, and others. Prudential denied claims and asserted reason for termination was not based on age, cause existed, Prince engaged in unauthorized trading, and Prince was "at-will" employee according to terms of the contract and other defenses. | Prudential liable to Prince for $211,000, 8% post award interest, and Prudential shall change language in form U-5. |
| 96 | Horvitz and Pezzimenti v. D. Blech & Co., Inc., Blech, NASD Case No. 96-01264 | May 19, 1997 | Claimants asserted breach of contract and constructive termination.  Blech denied claims and asserted Claimants voluntarily terminated employment, Claimants were "at-will" employees, failure to state a claim and others. | Blech liable to Pezzimenti for $50,900 and $8,400. Blech liable to Horvitz for $41,500 and $3,000. Blech liable to Claimants for attorneys fees, $1,000 (reimbursement of fees) and $500 (filing fee). |
| 97 | Jochim v. Kirkpatrick, Pettis, Smith, Polian, Inc., NASD Case No. 96-03670 | April 29, 1997 | Jochim asserted breach of employment compensation agreement.  Kirkpatrick Pettis denied claims and asserted Jochim was "at-will" employee and can unilaterally modify the agreement and that no agreement ever existed. | Kirkpatrick liable to Jochim for $53,537 (actual damages) and $2,400 (forum fees). |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 98 | Mait v. Oppenheimer & Co., Inc., NASD Case No. 95-02863 | April 7, 1997 | Mait asserted wrongful termination, filing false and defamatory form U-5 concerning termination, negligence, intentional infliction of emotional distress and others.  Oppenheimer denied claims and asserted Mait was "at-will" employee who may be terminated for any reason, many reasons existed to terminate Mait and other defenses. | Oppenheimer liable to Mait for $250,000 and attorneys fees to be determined later.  Also Oppenheimer shall change language on the form U-5 and file amendment. |
| 99 | Sprung v. PaineWebber, Inc., NASD Case No. 96-00699 | March 31, 1997 | Sprung asserted breach of contract, wrongful termination and defamation.  Paine Webber denied all claims and asserted Spring was "at-will" employee, cause existed for termination, statement on U-5 are privileged and counterclaimed for amount of note given to Sprung. | Paine Webber liable to Sprung for $50,000 plus interest (wrongful termination- compensatory damages), $10,000 plus interest (lost commissions- compensatory damages), and Paine Webber shall change language of form U-5. |
| 100 | Johnson v. Fitzgerald, Davis & Associates, L.P., et.al., NASD Case No. 95-00042 | March 17, 1997 | Johnson asserted breach of contract, promissory estoppel and equitable accounting.  Fitzgerald Davis denied all claims and asserted no promises were made but only initial projections, Johnson was "at-will" employee, Fitzgerald had cause to terminate Johnson and others defenses. | Fitzgerald liable to Johnson for $20,000 (actual damages). |
| 101 | Alghini v. The Chicago Corp., Wing, NASD Case No. 96-00317 | December 31, 1996 | Alghini asserted breach of contract, fraud, promissory estoppel and others.  Chicago denied claims and asserted claim not consistent with employment agreement, Alghini was an "at-will" employee and other defenses. | Chicago liable to Alghini for $265,000 (actual damages), and 8.25% interest on $65,000. |
| 102 | Oliver v. Metropolitan Life Ins. Co., Schlegel, NASD Case No. 95-04754 | December 31, 1996 | Oliver  asserted defamation, breach of employment contract, wrongful discharge, negligence and others.  MetLife denied claims and asserted Oliver was an "at-will" employee, termination was for cause, and other various defenses. | MetLife liable to Oliver for $45,000. |
| 103 | Fisk v. Lehwald, Orosey & Pepe, Inc., et.al., NASD Case No. 95-04985 | December 23, 1996 | Fisk asserted wrongful termination, defamation and breach of contract. Lehwald denied claims and asserted statements on U-5 are true and other defenses. | Lehwalds liable to Fisk for $97,000 (costs, interest and attorneys fees). Lehwald shall expunge Fisks form U-5. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 104 | PaineWebber, Inc. v. Sherwin, NASD Case No. 95-03271 | November 15, 1996 | Paine Webber fired Sherwin and asserted claim to collect amount due on forgivable note. Sherwin counterclaimed for wrongful termination. Paine Webber answered that Sherwin's termination was for cause due to unauthorized trading and Sherwin was an "at-will" employee. | Paine Webber liable to Sherwin for $138,505 (lost deferred compensation), $153,151 (lost commissions), $51,477 (lost general stock options), $171,566.50 (punitive damages). |
| 105 | Garrido, Jr. v. Merrill Lynch, Pierce, Fenner, Smith, Inc., NASD Case No. 97-00629 | August 26, 1996 | Garrido asserted wrongful termination, defamation and racial discrimination.  Merrill denied claims and asserted Garrido was an "at-will" employee who was appropriately terminated for engaging in an outside interest without prior approval of Merrill and others. | Merrill liable to Garrido for $6,800 (compensatory damages) and shall change the language on the form U-5 to state "allowed to resign." Merrill also liable to Garrido for $ 89,000 (attorneys fees). |
| 106 | Mosher v. Edward D. Jones & Co., Dye and Cahill, NASD Case No. 95-02062 | May 29, 1996 | Mosher asserted wrongful termination, breach of contract, age and disability discrimination and others.  Jones denied claims and asserted Mosher was an "at-will" employee and was terminated for lack of performance. | Edward D. Jones & Co. liable to Mosher for $30,000 (compensatory damages). |
| 107 | Tanner v. Prudential Bache Securities, 72 F.3d 234 (1st Cir. 1995) | December 29, 1995 | Several brokers in Prudential's Puerto Rico office filed arbitrations claims for wrongful termination. Prudential asserted they were all "at-will" employees.  The arbitrators awarded close to $3,000,000 to the claimants.  The award was confirmed by the U.S. District Court.  Prudential appealed to the 1st Circuit, and argued that the brokers had employment agreements "without fixed duration" and were otherwise terminated for cause. | The Appeals court found that Prudential "neither meets the standard for the vacation of an award on the grounds of manifest disregard,... nor demonstrates that the arbitration panel found that appellees acted against public policy. |
| 108 | Kiklas v. Glendale Federal Bank, Glenfed Brokerage Services, Delao, NASD Case No. 94-02554 | December 12, 1995 | Kiklas asserted defamation, wrongful termination, breach of fiduciary duty and negligence. Glendale denied claims and asserted Kiklas was an "at-will" employee and that cause existed for termination. | Glendale liable to Kiklas for $40,000. |

| No. | Case Name and No. | Date | Description | Holding |
|---|---|---|---|---|
| 109 | PaineWebber, Inc. v. Agron, 49 F.3d 347 (8th Cir. 1995). | March 1, 1995 | Agron asserted a claim for wrongful termination, defamation and others arising from his termination of employment by PaineWebber. PaineWebber asserted Agron was terminated for cause because Agron signed a client's name on an account transfer form. | PaineWebber contends that the award must be vacated because it manifestly disregards Kansas' employment-at-will doctrine.  This argument overlooks the very nature of this arbitration proceeding.  Even accepting that Kansas is an employment-at-will state, and further assuming that we would be willing to apply a manifest disregard analysis, PaineWebber's relationship with Agron under the oversight of the NASD contemplated the use of the arbitration procedure as a means of settling employment-related disputes.  This process necessarily alters the employment relationship from at-will to something else- some standard of discernable cause is inherently required in this context where an arbitration panel is called on to interpret the employment relationship.  If Agron's employment was purely at-will, the arbitration procedure designed to interpret that employment relationship would serve no identifiable purpose.  Accordingly, the arbitration panel had the power to determine whether the firing was justified. |
| 110 | Morrison v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et.al., NASD Case No. 93-3935 | February 8, 1995 | Morrison asserted breach of contract, fraud and others. Merrill denied claims and asserted Morrison was an "at-will" employee and was terminated for cause because production was inadequate. | Merrill liable to Morrison for $252,500. |
| 111 | Donnelly v. Sutro & Co., Inc., NASD Case No. 93-01988 | May 31, 1994 | Donnelly asserted breach of express and implied employment contract, wrongful termination and others.  Sutro denied claims and asserted Donnelly was an "at-will" employee who could be terminated at any time and Donnelly was terminated for cause. | Sutro liable to Donnelly for $144,981. |
| 112 | Agron v. PaineWebber, Inc., NASD Case No. 91-01408 | May 25, 1993 | Agron asserted wrongful termination, defamation and others.  Paine Webber denied claims and asserted Agron was terminated for cause because of forgery and other defenses. | Paine Webber liable to Agron for $50,000 (actual damages), $240,000 and released liability of forgivable the note. |

| No. | Case Name and No. | Date | Description | Holding |
|-----|-------------------|------|-------------|---------|
| 113 | Fahnestock v. Waltman, 1990 WL 124354 (S.D.N.Y. 1990) | August 23, 1990 | NYSE arbitration panel awarded damages to Waltman for defamation and wrongful termination. The arbitrators awarded $56,000 for compensatory damages, $100,000 for defamation on the U-5, and $100,000 in punitive damages. Fahnestock filed a motion to vacate the award. | United States District Court confirmed the award, holding that the arbitrators did not exceed their authority. |
| 114 | Pierce v. Shearson Lehman Hutton, Inc., 1990 WL 60751 (N.D.Ill. 1990). | April 26, 1990 | Pierce asserted claims of age discrimination and breach of contract arising from his employment with Shearson. Shearson raises the arbitrability of Pierce's claim in a motion to stay. | The Court held that an agreement to arbitrate disputes about employee discharges implies a requirement that discharges be only for "just cause." *Shearson Hayden Stone, Inc. v. Liang,* 653 F.2d 310, 312 (7th Cir. 1981) and cases cited therein.  In a case concerning an arbitration clause identical to the one here, the court in *Liang* found the arbitrators had the power to determine whether the employment contract was terminable at will or only for just cause. *Liang,* 6543 F.2d at 313.  Pierce's argument may be addressed by the arbitrators. |
| 115 | Smith v. Kerrville Bus Co., Inc., 709 F.2d 914 (5th Cir. 1983). | July 18, 1983 | Smith asserted a claim for wrongful discharge arising from his employment with the Kerrville Bus Company.  Smith was fired for "mishandling of company property." Kerrville asserted that Smith was an "at-will" employee because the collective bargaining agreement contains no express provision relating to discharge.  Smith argued that a "just cause" restriction applied because of the collective bargaining agreement's abbreviated grievance procedure either alone or in conjunction with the specific grounds for dismissal set forth in the Drivers Rule Book. | The Court held that inherent in the body of arbitral common law which has evolved in this context is a marked awareness of the harshness of discharge, and an adherence to the principle that seniority, grievance, arbitration, and other provisions that reflect the contracting parties' tacit acceptance of the employees' right to some measure of job security, pretermit discharge without good cause.  Several courts, in reviewing an arbitral finding of a "just cause" impediment to discharge, have determined that the arbitrator properly circumscribed the employer's power to fire by implying an objective limitation from the terms of the labor contract, as amplified by evidence of the parties' intentions, citing Shearson v Liang, *See* Tab 84. |

| No. | Case Name and No. | Date | Description | Holding |
|-----|-------------------|------|-------------|---------|
| 116 | Shearson Hayden Stone, Inc. v. Liang, 653 F.2d 310 (7th Cir. 1981). | July 10, 1981 | Liang asserted a claim for wrongful discharge arising from his employment with Shearson. Liang was fired because of his affiliation with an outside activity, an X-rated movie theatre. Shearson moved to vacate the arbitrator's award in favor of Liang claiming there was no evidence to support the award. | The Court held that Shearson's argument that Liang's employment was terminable at will is without merit.  It has been held repeatedly that an agreement to arbitrate disputes about employee discharges implies a requirement that discharges be only for "just cause." |

Exhibit 6

## Curtis Carlson

| | |
|---|---|
| **From:** | Mintz, Marcie S [Marcie.Mintz@morganstanley.com] |
| **Sent:** | Friday, October 4, 2013 3:55 PM |
| **To:** | Curtis Carlson |
| **Subject:** | RE: Peter Wallace |

I have been traveling and will be again next week. Have not had an opportunity to look into this as of yet.

**From:** Curtis Carlson [mailto:carlson@carlson-law.net]
**Sent:** Wednesday, October 02, 2013 4:43 PM
**To:** Mintz, Marcie S (LEGAL)
**Subject:** Peter Wallace

Marcie:

I understand that Morgan Stanley was given one or more recordings of Peter's conversations with a representative of the annuity company. Please send me via email the recordings. Thanks.

Curtis Carlson
Carlson & Lewittes, P.A.
One S.E. Third Avenue
Suite 1200
Miami, FL 33131
305-372-9700
www.carlson-law.net

Important Notice to Recipients:

The sender of this e-mail is an employee of Morgan Stanley Smith Barney LLC ("Morgan Stanley"). If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Erroneous transmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. This message is subject to terms available at the following link: http://www.morganstanley.com/disclaimers/mssbemail.html. If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you consent to the foregoing.

## Curtis Carlson

| | |
|---|---|
| **From:** | Mintz, Marcie S [Marcie.Mintz@morganstanley.com] |
| **Sent:** | Thursday, October 24, 2013 12:26 PM |
| **To:** | Curtis Carlson |
| **Subject:** | RE: Peter Wallace |

Curt

I apologize for the delay in responding to your initial email.

The recordings that you request are the property of Allianz Life Insurance and not Morgan Stanley. Therefore, it would be best that this request be made of Allianz Life Insurance directly.

Marcie Mintz, Esq.
Executive Director
Morgan Stanley Smith Barney/Legal and Compliance
2000 Westchester Ave, 3rd Floor/Purchase, NY 10577
Phone: +1 914 225-5639
Fax: +1 914 729-2888
marcie.mintz@morganstanleysmithbarney.com

---

**From:** Curtis Carlson [mailto:carlson@carlson-law.net]
**Sent:** Thursday, October 24, 2013 8:19 AM
**To:** Mintz, Marcie S (LEGAL)
**Subject:** Peter Wallace

Marcie:

I am writing to remind you about my client's request for the recordings.

Curtis Carlson
Carlson & Lewittes, P.A.
One S.E. Third Avenue
Suite 1200
Miami, FL 33131
305-372-9700
www.carlson-law.net

---

Important Notice to Recipients:

The sender of this e-mail is an employee of Morgan Stanley Smith Barney LLC ("Morgan Stanley"). If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Erroneous transmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. This message is subject to terms available at the following link: http://www.morganstanley.com/disclaimers/mssbemail.html. If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you consent to the foregoing.

## Curtis Carlson

| | |
|---|---|
| **From:** | Mintz, Marcie S [Marcie.Mintz@morganstanley.com] |
| **Sent:** | Thursday, October 24, 2013 2:26 PM |
| **To:** | Curtis Carlson |
| **Subject:** | Peter Wallace |

Curt

This is the contact at Allianz. I am not sure whether or not you will be asked to go through their legal department.

**Barb Krueger,** CFE
Senior Special Investigator
barb.krueger@allianzlife.com
d: 763.765.5263
800.328.5601 x45263

**Allianz Life Insurance Company of North America** | www.allianzlife.com

Marcie Mintz, Esq.
Executive Director
Morgan Stanley Smith Barney/Legal and Compliance
2000 Westchester Ave, 3rd Floor/Purchase, NY 10577
Phone: +1 914 225-5639
Fax: +1 914 729-2888
marcie.mintz@morganstanleysmithbarney.com

Important Notice to Recipients:

The sender of this e-mail is an employee of Morgan Stanley Smith Barney LLC ("Morgan Stanley"). If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Erroneous transmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. This message is subject to terms available at the following link: http://www.morganstanley.com/disclaimers/mssbemail.html. If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you consent to the foregoing.

**Curtis Carlson**

| | |
|---|---|
| **From:** | Barb.Krueger@allianzlife.com |
| **Sent:** | Friday, October 25, 2013 8:23 AM |
| **To:** | Curtis Carlson |
| **Subject:** | Re: Fwd: Peter Wallace |

Mr. Carlson -

In response to your request for copies of recorded phone conversations between Mr. Wallace and Allianz Life representatives, we are unable to provide them to you

Barb Krueger

**Barb Krueger,** CFE
Principal Special Investigator

barb.krueger@allianzlife.com
d:  763.765.5263  Fax:  763.765.6355

**Allianz Life Insurance Company of North America** | www.allianzlife.com

Allianz. For all that's ahead.

🖎 **Think green - Please consider the environment before printing this email.**

| | |
|---|---|
| From: | Curtis Carlson <carlson@carlson-law.net> |
| To: | "barb.krueger@allianzlife.com" <barb.krueger@allianzlife.com>, |
| Date: | 10/24/2013 02:00 PM |
| Subject: | Fwd: Peter Wallace |

Dear Ms. Krueger:

I represent Mr. Peter Wallace who, until recently, was employed by Morgan Stanley. We understand that you or your company has one or more recorded conversations between Mr. Wallace and a representative of your company and that copies of these recordings were given to Morgan Stanley.

We demand copies of any and all recordings made of Mr. Wallace. Please forward them to me. Thank you.

Curtis Carlson
Sent from my iPhone

Begin forwarded message:

**From:** "Mintz, Marcie S" <Marcie.Mintz@morganstanley.com>

1

**Date:** October 24, 2013, 2:26:00 PM EDT
**To:** "Curtis Carlson" <carlson@carlson-law.net>
**Subject: Peter Wallace**

Curt

This is the contact at Allianz. I am not sure whether or not you will be asked to go through their legal department.

**Barb Krueger,** CFE
Senior Special Investigator
barb.krueger@allianzlife.com
d: 763.765.5263
800.328.5601 x45263

**Allianz Life Insurance Company of North America | www.allianzlife.com**

Marcie Mintz, Esq.
Executive Director
Morgan Stanley Smith Barney/Legal and Compliance
2000 Westchester Ave, 3rd Floor/Purchase, NY 10577
Phone: +1 914 225-5639
Fax: +1 914 729-2888
marcie.mintz@morganstanleysmithbarney.com

---

Important Notice to Recipients:

The sender of this e-mail is an employee of Morgan Stanley Smith Barney LLC ("Morgan Stanley"). If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Erroneous transmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. This message is subject to terms available at the following link: http://www.morganstanley.com/disclaimers/mssbemail.html. If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you consent to the foregoing.
------------------------------------- CONFIDENTIALITY NOTICE: The information in this message, and any files transmitted with it, is confidential, may be legally privileged, and intended only for the use of the individual(s) named above. Be aware that the use of any confidential or personal information may be restricted by state and federal privacy laws. If you are not the intended recipient, do not further disseminate this message. If this message was received in error, please notify the sender and delete it.

**Curtis Carlson**

| | |
|---|---|
| **From:** | Barb.Krueger@allianzlife.com |
| **Sent:** | Tuesday, October 29, 2013 3:49 PM |
| **To:** | Curtis Carlson |
| **Subject:** | RE: Peter Wallace |

Mr. Carlson -

We would not consider your request until we have a letter of representation on your letterhead.   If you could provide this letter, I will speak see if we can provide the information you have requested.

Sincerely,

Barb Krueger

**Barb Krueger,** CFE
Principal Special Investigator

barb.krueger@allianzlife.com
d:  763.765.5263  Fax:  763.765.6355

**Allianz Life Insurance Company of North America** | www.allianzlife.com

Allianz. For all that's ahead.

Think green - Please consider the environment before printing this email.

| | |
|---|---|
| From: | "Curtis Carlson" <carlson@carlson-law.net> |
| To: | "Curtis Carlson" <carlson@carlson-law.net>, <Barb.Krueger@allianzlife.com>, |
| Date: | 10/29/2013 01:52 PM |
| Subject: | RE: Peter Wallace |

Ms. Krueger.

This is my second request for information.  Please respond.

Curtis Carlson
Carlson & Lewittes, P.A.
One S.E. Third Avenue
Suite 1200
Miami, FL 33131
305-372-9700
www.carlson-law.net

1

**From:** Curtis Carlson
**Sent:** Friday, October 25, 2013 9:04 AM
**To:** Barb.Krueger@allianzlife.com
**Subject:** Re: Peter Wallace

Why?

Certainly, as a participant in the conversation(s), Mr. Wallace has a right to a recording made of him. Do you disagree?
Curtis Carlson
Sent from my iPhone

On Oct 25, 2013, at 8:22 AM, "Barb.Krueger@allianzlife.com" <Barb.Krueger@allianzlife.com> wrote:

Mr. Carlson -

In response to your request for copies of recorded phone conversations between Mr. Wallace and Allianz Life representatives, we are unable to provide them to you

Barb Krueger

**Barb Krueger**, CFE
Principal Special Investigator

barb.krueger@allianzlife.com
d:  763.765.5263  Fax:  763.765.6355

**Allianz Life Insurance Company of North America** | www.allianzlife.com

Allianz. For all that's ahead.

Think green - Please consider the environment before printing this email.

| | |
|---|---|
| From: | Curtis Carlson <carlson@carlson-law.net> |
| To: | "barb.krueger@allianzlife.com" <barb.krueger@allianzlife.com>, |
| Date: | 10/24/2013 02:00 PM |
| Subject: | Fwd: Peter Wallace |

Dear Ms. Krueger:

I represent Mr. Peter Wallace who, until recently, was employed by Morgan Stanley. We understand that you or your company has one or more recorded conversations between Mr. Wallace and a representative of your company and that copies of these recordings were given to Morgan Stanley.

We demand copies of any and all recordings made of Mr. Wallace. Please forward them to me. Thank you.

2

Curtis Carlson
Sent from my iPhone

Begin forwarded message:

**From:** "Mintz, Marcie S" <Marcie.Mintz@morganstanley.com>
**Date:** October 24, 2013, 2:26:00 PM EDT
**To:** "Curtis Carlson" <carlson@carlson-law.net>
**Subject: Peter Wallace**

Curt

This is the contact at Allianz. I am not sure whether or not you will be asked to go through their legal department.

**Barb Krueger**, CFE
Senior Special Investigator
barb.krueger@allianzlife.com
d: 763.765.5263
800.328.5601 x45263

**Allianz Life Insurance Company of North America** | www.allianzlife.com

Marcie Mintz, Esq.
Executive Director
Morgan Stanley Smith Barney/Legal and Compliance
2000 Westchester Ave, 3rd Floor/Purchase, NY 10577
Phone: +1 914 225-5639
Fax: +1 914 729-2888
marcie.mintz@morganstanleysmithbarney.com

_____

Important Notice to Recipients:

The sender of this e-mail is an employee of Morgan Stanley Smith Barney LLC ("Morgan Stanley"). If you have received this communication in error, please destroy all electronic and paper copies and notify the sender immediately. Erroneous transmission is not intended to waive confidentiality or privilege. Morgan Stanley reserves the right, to the extent permitted under applicable law, to monitor electronic communications. This message is subject to terms available at the following link. http://www.morganstanley.com/disclaimers/mssbemail.html. If you cannot access this link, please notify us by reply message and we will send the contents to you. By messaging with Morgan Stanley you consent to the foregoing.
----------------------------------------- CONFIDENTIALITY NOTICE: The information in this message, and any files transmitted with it, is confidential, may be legally privileged, and intended only for the use of the individual(s) named above. Be aware that the use of any confidential or personal information may be restricted by state and federal privacy laws. If you are not the intended recipient, do not further disseminate this message. If this message was received in error, please notify the sender and delete it.

3

**Curtis Carlson**

| | |
|---|---|
| **From:** | Barb.Krueger@allianzlife.com |
| **Sent:** | Wednesday, October 30, 2013 11:40 AM |
| **To:** | Rosa Lemus |
| **Cc:** | Curtis Carlson |
| **Subject:** | Re: Peter Wallace |
| **Attachments:** | ATT30342.png |

Ms. Lemus,

Thank you.  I received the fax earlier this morning.   I will get back to Mr. Carlson after I have spoken with our legal counsel.

Sincerely,

Barb Krueger


**Barb Krueger**, CFE
Principal Special Investigator

barb.krueger@allianzlife.com
d:  763.765.5263  Fax:  763.765.6355

**Allianz Life Insurance Company of North America** | www.allianzlife.com

Allianz. For all that's ahead.

 Think green - Please consider the environment before printing this email.




| | |
|---|---|
| From: | "Rosa Lemus" <Lemus@carlson-law.net> |
| To: | <Barb.Krueger@allianzlife.com>, |
| Cc: | <carlson@carlson-law.net> |
| Date: | 10/30/2013 09:56 AM |
| Subject: | Peter Wallace |




Attached please find a letter of representation.  Should you have any problems with the attachment, please contact our office.  Thank you.

*Rosa Lemus*
*Legal Assistant*
*lemus@carlson-law.net*

1

**Curtis Carlson**

| | |
|---|---|
| **From:** | Barb.Krueger@allianzlife.com |
| **Sent:** | Wednesday, November 6, 2013 2:28 PM |
| **To:** | Curtis Carlson |
| **Cc:** | Rosa Lemus |
| **Subject:** | RE: Peter Wallace |
| **Attachments:** | 20131106132553065.pdf; ATT35546.png |

Mr. Carlson -

Barb Krueger

**Barb Krueger**, CFE
Principal Special Investigator

barb.krueger@allianzlife.com
d:  763.765.5263  Fax:  763.765.6355

**Allianz Life Insurance Company of North America** | www.allianzlife.com

Allianz. For all that's ahead.

🖐 Think green - Please consider the environment before printing this email.

| | |
|---|---|
| From: | "Curtis Carlson" <carlson@carlson-law.net> |
| To: | <Barb.Krueger@allianzlife.com>, "Rosa Lemus" <Lemus@carlson-law.net>, |
| Date: | 11/05/2013 01:37 PM |
| Subject: | RE: Peter Wallace |

Ms. Krueger:

I am following up and renewing our request for the recordings.

Curtis Carlson
Carlson & Lewittes, P.A.
One S.E. Third Avenue
Suite 1200
Miami, FL 33131
305-372-9700
www.carlson-law.net

1

**From:** Barb.Krueger@allianzlife.com [mailto:Barb.Krueger@allianzlife.com]
**Sent:** Wednesday, October 30, 2013 11:40 AM
**To:** Rosa Lemus
**Cc:** Curtis Carlson
**Subject:** Re: Peter Wallace

Ms. Lemus,

Thank you.  I received the fax earlier this morning.   I will get back to Mr. Carlson after I have spoken with our legal counsel.

Sincerely,

Barb Krueger

**Barb Krueger,** CFE
Principal Special Investigator

barb.krueger@allianzlife.com
d:  763.765.5263  Fax:  763.765.6355

**Allianz Life Insurance Company of North America | www.allianzlife.com**

Allianz. For all that's ahead.

🐸 Think green - Please consider the environment before printing this email.

| | |
|---|---|
| From: | "Rosa Lemus" <Lemus@carlson-law.net> |
| To: | <Barb.Krueger@allianzlife.com>, |
| Cc: | <carlson@carlson-law.net> |
| Date: | 10/30/2013 09:56 AM |
| Subject: | Peter Wallace |

Attached please find a letter of representation.  Should you have any problems with the attachment, please contact our office.  Thank you.

*Rosa Lemus*
*Legal Assistant*
*lemus@carlson-law.net*

# CARLSON & LEWITTES
A PROFESSIONAL ASSOCIATION

ONE S.E. THIRD AVENUE | SUITE 1200 | MIAMI, FL 33131
T: 305-372-9700 | F: 305-372-8265 | www.carlson-law.net
[attachment "carlson.allianzlife.2013.10.30.pdf" deleted by Barb Krueger/allianzlife]

2

----------------------------------------- CONFIDENTIALITY NOTICE: The information in this message, and any files transmitted with it, is confidential, may be legally privileged, and intended only for the use of the individual(s) named above. Be aware that the use of any confidential or personal information may be restricted by state and federal privacy laws. If you are not the intended recipient, do not further disseminate this message. If this message was received in error, please notify the sender and delete it.

Allianz Life Insurance Company of North America

**Allianz** ⑪

Barb Krueger, CFE
Principal Special Investigator

5701 Golden Hills Drive
Minneapolis, MN  55416-1297

Toll Free:  800/328.5601 Ext 45263
Telefax:    763/765.6355

November 6, 2013

Curtis Carlson
Carlson & Lewittes
One southeast Third Avenue
1200 Sun trust International Center
Miami, FL  33131

RE:  Peter Wallace

Dear Mr. Carlson:

I am writing in response to your October 30, 2013 letter, regarding the recorded calls between representatives of Allianz and Peter Wallace.

We are unable to provide copies of these calls to you.

If you have any questions, please call me.  I can be reached at 763.765.5263.

Sincerely,

Barb Krueger